No. 32,897

Marion Roberts, *Appellee,* v. Martha Dockstader, *Appellant.*

(61 P. 2d 114)

Opinion

filed October 10, 1936.

C. L. Kagey, Hal M. Black, L. M. Kagey, all of Wichita, *Leon W. Lundblade,* of Beloit, and *W. O. Wanzer,* of Long Beach, Cal., for the appellant.

*R. L. Hamilton* and *Ralph H. Noah,* both of Beloit, for the appellee; *L. A. Willett,* of Beloit, of counsel.

The opinion of the court was delivered by

Burch, C. J.: The action was one by a divorced wife, Marion Roberts, against a widow, Martha Dockstader, for damages for alienation of the affection of plaintiff's husband, Earl Roberts. The jury disagreed. Defendant appeals, urging as error the overruling of defendant's demurrer to plaintiff's evidence, and refusal of the court to direct the jury to return a verdict for defendant. Whether, at the close of the evidence, the case should have been taken from the jury will alone be considered.

Marion and Earl were married in June, 1921. The only letters Marion produced showing that Earl had any affection for his wife were written in May and June, 1931. In June, 1933, Earl was showing lack of consideration for and harshness toward Marion. About February 1, 1934, and about March 14, 1934, Earl used physical violence against his wife, and on March 20, 1934, he left her. On April 23, 1934, Earl filed an action for divorce. The petition was amended on June 27, 1934. The amended petition charged Marion with gross improprieties in accepting the attentions of seven men, married and unmarried, whose names were given to her attorneys.

Marion filed an answer, denying impropriety of conduct, and alleging the divorce action was a scheme on the part of Earl and Martha Dockstader, whereby they might carry on an amorous relationship without interference from Marion. Marion also filed a

cross petition, alleging extreme cruelty and gross neglect of duty. Specific acts of physical cruelty were alleged. The cross petition further alleged association of Earl and Martha under circumstances to which Marion objected, and prayed for divorce.

Marion obtained a decree of divorce from Earl on July 11, 1934. Earl's petition was withdrawn and Marion's answer, except the general denial, was withdrawn. Marion introduced evidence in support of her cross petition. The court made a general finding for Marion that a divorce should be granted to her on the grounds of extreme cruelty and gross neglect of duty. Alimony and property matters were settled by stipulation. The present action for alienation of affection was promptly commenced on July 14, 1934.

About August 1, 1934, less than a month after the divorce from Marion, Earl commenced going with a young woman of Wichita, whom he married in February, 1935. There was disputed testimony that Marion protested against this attachment of Earl, on the ground it would ruin her lawsuit, and there was disputed testimony Marion threatened to get Earl's job unless he helped her in her lawsuit. There was undisputed testimony Marion acquired from Earl letters written to him by Martha after the divorce action was commenced, and it was undisputed that, at the time of trial, Earl owed Marion $500 unpaid alimony and $150, money borrowed to enable Earl to buy a car.

Earl's deposition was taken by Martha. He proved to be intermittently forgetful. He was able to remember distinctly that some things did not occur, he was able to remember distinctly some things did occur, but on various important subjects his memory failed. He could not remember. To illustrate:

Earl did remember he had a fight with one of the men named in the divorce petition, and Marion testified he had fights with some of them. One night, Earl started to his place of business and came back. A man referred to in the divorce petition was in his home. Earl testified some trouble occurred. He then testified as follows:

"Q. What happened when you went in? A. Well, I just don't recall; there wasn't anything happened then.

"Q. Did you have some conversation with them? A. I just don't recall. I just don't remember."

Generally, whatever Earl remembered unfavorable to Marion's case—and he remembered he left her of his own accord because he was "fed up"—may not be considered in this appeal, since he was

Martha's witness. In one instance his corroborated and undisputed testimony will be accepted as true.

At the time of the trial in October, 1935, Martha Dockstader was thirty-two years old, and the brief for Marion takes pains to say, without citation to the abstract, that Martha is wealthy. That might perhaps be subsumed from the nature of the case.

Martha was married to Noel Dockstader in 1923, and at the time of the trial had one child, a boy three and one half years old. Noel Dockstader was killed in an automobile accident in the early hours of December 26, 1933. There was no testimony that Noel and Martha Dockstader were not devoted to each other until the time of his death.

The time between Noel's death, December 26, 1933, and March 20, 1934, when Earl left his wife, was too short for Martha to break up a home where marital love and duty prevailed, even if a fast worker, so interference of Martha in the domestic affairs of Marion and Earl was dated back of Noel's death.

In the summer of 1933 Martha and Earl played golf together. Part of the time Noel was away from home. Noel sometimes played. Marion did not play golf much. Marion's brief says Martha would call for Earl to play practically every day. Marion's testimony was, either Martha would call for Earl or Earl would call for Martha. Marion's witness, the caretaker of the golf course, said Martha and Earl played probably two or three times a week. The caretaker, whose duty required him to be at the golf course every day, saw a number of other players there, and never saw anything wrong between Martha and Earl while at the golf course. Marion testified she did not approve of this association, but she said nothing to Martha, and during the period in question, Marion said she was at Martha's house, or Martha was at Marion's house, every day. Marion's cross petition in the divorce suit gave the date of her strenuous objection to the association of Earl and Martha as in the months of February and March, 1934, after Noel Dockstader's death.

On Christmas night, 1933, there was a dance at Cawker City, and a number of persons went to the dance from Beloit. Neither Marion nor Martha went in the same car with her husband. There were five persons in the car in which Martha rode, one of them her sister. Earl was in that car. There was no evidence Earl rode in the same seat with Martha. The reasons for the members of the

party going as they did were well known to Marion, were given in evidence, and were not disputed, but according to a practice followed throughout the trial, Marion's evidence was framed to suppress indisputable characterizing details.

Marion testified Earl did not ask her to dance with him at Cawker City. Earl danced very little, whether with Martha at all is not disclosed. Marion said that when she did see Earl he was with Martha. How often Marion saw Earl, where she saw him, and where he was when she did or did not see him, are not disclosed. In the night everybody went to a restaurant. Marion saw Earl but did not say Martha was with him there. Marion said she lost her own crowd, and she asked a man who was referred to in the divorce petition to take her home. The man testified he saw Marion looking for her husband, but he did not testify whether Martha was or was not in plain view.

Marion's escort took her to Beloit, took her to the Dockstader home, and Noel was there. Then follows, in Marion's testimony, an account of Noel's receiving a telephone call, of leaving, and never returning. Then followed other telephone calls, one from Earl at Glen Elder, asking if Noel had started yet. Marion then said Earl and Martha arrived about four in the morning, and Earl left to hunt Noel.

How the Beloit party, except Marion and her companion, started home, is disclosed by Martha's testimony, but not by any witness called by Marion, and Marion offered no rebuttal. What happened on the way home, occasioning the telephone call to Noel, is disclosed by Martha's testimony, but not by any witness called by Marion, and Marion offered no rebuttal. Earl had no car on the trip to Cawker City, and how it came about that Earl and Martha arrived together is disclosed, but not by any witness called by Marion, in chief or in rebuttal.

The evidence was that the telephone call which Noel received at home when Marion was present, just before he left, never to return, was from Martha, asking Noel to come for her at Glen Elder. It would be strange if Noel did not tell Marion why he was leaving and where he was going, but Marion's testimony did not cover the subject. Noel's car went into a ditch. His body was found between Beloit and Glen Elder, and he died in a hospital the next morning. The court cannot consider the testimony that Martha called from Glen Elder for her husband to bring her home, but the

court declines to allow Marion's account of what occurred to be filled out with vicious surmises.

Considering the testimony of the night's occurrences favorable to Marion, any notion that Martha was designedly trying to steal Earl's affection from Marion, or was purposely placing herself in position to do so, is groundless insinuation.

Some incidents occurring in 1933 have not been mentioned, because all the evidence relating to the association of Earl and Martha before Noel's death is stage scenery, with occasional lurid lighting effect by Marion's counsel, as the following instance will show:

On a day in June, 1933, Marion's mother was in a hospital following a serious operation. Marion was in attendance on her mother practically all that day and most of the night before. She left the hospital in the evening, went home, and Earl was not there. She went to a restaurant and was sitting with Mrs. Beardmore, when Earl came in. Earl said he was going to a dance at Concordia. Marion asked him not to go, because of the condition of her mother. He said, "Hell, yes," he was going, and what could Marion do about it? Marion asked if Martha Dockstader was going, and he said, "Hell, yes." The court permitted this testimony to be introduced by Marion herself. The purpose was to show Earl's attitude. The significant feature was, it revealed an attitude which bordered on brutality toward his wife. That night Marion called a residence in Concordia where the dancers were, and asked for Earl. She talked to Mrs. Daniels, a member of a group with which Earl associated, but did not talk to Earl.

A partial account of the Concordia dance affair was given by a witness for Martha, Mrs. Freeman. Martha's husband was working that night. Earl went to Concordia and returned from Concordia in the Freeman car. Martha went to Concordia and returned from Concordia in the Daniels' car. Mrs. Daniels, with whom Marion said she talked at Concordia, was a witness at the trial. If Marion had wished to disclose the facts she could have done so. After the facts were disclosed, Marion offered nothing in rebuttal. Notwithstanding this record, the brief of counsel for Marion contains the following astonishing paragraph:

"When the court considered the evidence relative to appellant [Martha Dockstader] taking appellee's husband [Earl Roberts] to the dance at Concordia at the time appellee's mother was seriously ill at the hospital at Beloit, appellee later tried to get in touch with her husband by telephone, and though

she got the house where appellant and her husband were, he was not called to the telephone, and it is a fair inference that he was prevented by appellant."

By March 20, 1934, Martha's supposed designs to alienate Earl's affections from his wife had accomplished their fell purpose. Earl left his wife and never returned to her. On April 23, he filed his petition for divorce. Therefore, the alienation of Earl's affection from his wife, by what Marion's counsel call the dashing widow, occurred between December 26, 1933, and March 20, 1934.

Before examining the evidence, it may be helpful to consider the law.

In the case of *Powers v. Sumbler,* 83 Kan. 1, 110 Pac. 97, a paragraph of the syllabus reads:

"3. In an action by the wife against a stranger to recover damages for the alienation of the affections of her husband the court correctly charged that in order for the plaintiff to recover it was necessary to show that it was the efforts of the defendant which were the controlling cause that destroyed the affection which the plaintiff's husband had for her and caused their separation, and that the acts of the defendant were done knowingly and intentionally, for the purpose of alienating the husband's affections."

In the syllabus in the case of *Burch v. Goodson,* 85 Kan. 86, 116 Pac. 216, the means of alienation are spoken of as "continued willful machinations," and in any case, there must be deliberate effort directed to the specific end, alienation.

In cases of this character, alienation may be proved in two ways: First, by facts directly showing alienation. It is sometimes difficult to do this. Second, alienation may be established by proof of facts and circumstances warranting a reasonable inference of deliberate practice of means of alienation, resulting in alienation. Concerning this kind of proof, the opinion in the case of *Ogg v. Ogg,* 124 Kan. 443, 260 Pac. 647, reads:

"Plaintiff testified that she thought they, or Father Ogg, was trying to get William away from her, but the record other than above and similar quotations, discloses nothing more than surmise. And surmise, conjecture, speculation, plausibility, do not supply the want of proof. Guilt may not be inferred from opportunity." (p. 446.)

The Ogg case was one in which a parent was sued. A parent has more privilege to interfere in the domestic affairs of a child than a stranger. That fact, however, does not have any bearing on the subject of quality of proof. The difference between legitimate inference and surmise is the same in all cases, and in the Ogg case a railroad negligence case was cited in support of the matter quoted above.

One subject may as well be taken out of Marion's case now, and that is the subject of sexual relations between Earl and Martha. Marion's cross petition in the divorce action did not charge that Earl had been guilty of adultery. The petition for alienation of affection did not charge sexual relations between Earl and Martha, either as ground for recovery, or for enhancement of damages. There was no evidence, direct or circumstantial, that sexual desire ever entered into the relation between Earl and Martha. At the close of all the evidence, counsel for Marion made the following statement:

"We didn't allege any seduction, we didn't claim to be able to prove that."

However, it is argued here by Marion's counsel that Martha made a most damaging admission: Marion testified that on the 14th day of May, long after Earl's desertion, and after his divorce action was commenced, she saw Martha on the street, in front of a drug store, went to where Martha stood, and told Martha she had just talked to Earl. Marion then proceeded as follows:

"I told her that he had admitted everything, even to spending the night with her that Saturday night, and that I wanted to talk to she and Earl together, and that I knew she could get in touch with him, but I didn't think I could. And also told her that if they loved each other and he wanted to leave me, I guessed I couldn't stop it, but I thought he should take care of his debts.

"Q. Now what did she say? A. She agreed to have him here the next night.

"Q. Did you see Martha any more? A. No, the next morning she left for California."

There was undisputed evidence offered by Marion that before May 11 Martha had arranged to go to California and was anxious to get started.

Counsel for Marion knew perfectly well that what Marion said Earl said could not be used as evidence relating to conduct of Earl and Martha, and so effort is made to implicate Martha by what Martha did, on the occasion of the conversation.

Marion did get out of an automobile in which two women remained, and proceeded to talk to Martha. On cross-examination, and after challenging an inaccurate statement by Marion's counsel, Martha said she heard Marion's testimony, denied she had a conversation such as Marion related, and testified:

"She said, 'I have talked to Earl. He admits things;' she said, 'What are you going to do about it?' or some such remark.

"Q. And what did you say? A. I didn't say anything. I turned and left her.

. . . . . . . . . . . . . .

"Q. What did she say that he had admitted? A. She didn't say he had admitted anything."

Martha also testified Marion said something about getting in touch with Earl.

Marion's brief contains the following:

"The . . . appellant admittedly said nothing and turned and walked away. The court might consider this as the act of an innocent person, or, if he has had experience in common with mankind he could consider this as one of the most damning admissions capable of being made."

From the court's experience in common with mankind, the court would say that, as one accosted on a public street by a woman who commenced to babble about getting in touch with her husband, to whom she had just talked, presumably by telephone, so long he admitted everything, including his adultery on a specified night, Martha's conduct accorded with that of a well-bred person. From the court's judicial experience in considering the probative force of conduct, the court must say an imputation that Martha admitted anything does not rise to the dignity of what is termed in law a rational inference.

Turning to the evidence of alienation, there was testimony for Marion that about Thanksgiving, 1933, she and Earl moved into an apartment. Friends would come to the apartment, Martha and seven or eight others, including Martha's husband. The "bunch" went to the dance at Cawker City Christmas night. After Noel Dockstader's death, Vernon and Dora Daniels stayed at Martha's house for three weeks. Then Anna Annan stayed for a time, and Mr. and Mrs. Daniels came frequently in the evening. It was a common occurrence for young people to drop in almost every evening. Earl would come, and sometimes Marion came with Earl.

Alma Moxter, a witness for Marion, worked for Martha from June, 1933, to April 11, 1934. She had a room upstairs, and sometimes knew who came. Earl would stop in once a day and say, "hello," but Alma did not remember he ever stayed. Sometimes when he came others would be there. Sometimes when the crowd was there Earl would fix the fire before leaving, and sometimes, when Earl brought Martha home, he would fix the fire. Martha's house was a large house of fourteen or fifteen rooms, heated by a

coal-burning furnace, and whether the fire kept over night depended on when coal was put on. Martha's testimony was, she was not strong enough to attend the furnace, and Alma Moxter testified she took care of the furnace practically all the time. Although he did so frequently, there was no testimony Martha ever asked Earl to fix the fire.

Alma testified that one night, just before Earl left Marion, Alma heard the door open and two persons came in. They were Earl and Martha. Alma came downstairs in her nightgown and asked if Earl had gone down to throw coal in the furnace. He said, "No, but I will," and the evidence was he did. Alma said she believed the lights were off, and she went upstairs to bed.

Martha testified she was at the Daniels home, Earl was there, and when she was ready to go home, Earl offered to take her, which he did. When they arrived, he said not to turn the lights on, he would turn on the basement light and fix the fire. He also said, "Marion will probably be riding around. I will just turn on the basement light and fix the fire." When Alma came down and asked about the fire, Earl said, "I will fix the fire."

Alma Moxter testified that the next day she apologized to Martha for coming down in her nightgown, and Martha said that was all right, they were just in the room, hiding from Marion. What the joke, or ruse, or what-not, toward Marion was, nobody knows, and in dealing with the known facts derived from Alma's testimony, or her testimony supplemented by that of Martha, nobody has any license to use the method of Marion's counsel in discussing the Concordia dance.

Marion testified that on the evening of March 12, 1934, she learned that Martha was coming to Marion's house that evening, and Marion called Martha by telephone.

From whom did Marion learn that Martha was coming over that evening? Of course Marion furnished no information on the subject. There were two witnesses who did give testimony on the subject. One was Martha, and one was Earl. Marion herself invited Martha. With full opportunity to do so, Marion did not deny the fact after evidence of the fact had been introduced, and the sole and undisputed evidence will be accepted as true.

Martha went to Marion's house that night. The accounts of the events of the evening by Earl and Martha were very simple. Marion invited Martha down, telling Martha she was going to the first

picture show with her mother, but would return about nine o'clock. The picture show was over about nine o'clock, and Martha walked to Marion's house, a distance of a block or two. Ed Eresch was there when Martha arrived. Marion did not arrive. The three played rummy until about eleven, when Eresch and Earl took Martha home in Eresch's car. Earl testified Marion got home about ten minutes to twelve o'clock.

Marion's account was, that after she "learned" Martha was coming, she telephoned Martha she was going, not to the first picture show, but to the second show. She did not go to any picture show With a Mrs. Beardmore, she rode around and then parked her car where she could watch her apartment. About 9 o'clock Earl came home. Marion had previously testified that Earl's business, working for the express company, required him to meet a nine o'clock train, which took from fifteen to thirty minutes. In about ten minutes after Earl came home Martha arrived. Marion said Martha came in her own car. Later Eresch came and stayed a little while. Then Marion and Mrs. Beardmore rode around for a while and came back. A little later Earl and Martha left, and Marion could find nothing more of them. Where she looked or inquired she did not say. Earl got home about three in the morning.

Mrs. Beardmore, as a witness for Marion, said that on the night in question she was in a parked car where she could see the Roberts apartment. She said Earl came home, and she saw Martha and Eresch go up to the apartment. Eresch left in about half an hour. Earl and Martha left about three quarters of an hour after that. Then Mrs. Beardmore and Marion went down to a drug store and got a drink.

Concerning this incident, Marion's attorneys say that one night a short time before Earl left his wife, Martha, knowing Marion would be away, held a clandestine meeting with Earl. Of course, Eresch is not mentioned. Whether he had been invited, and if so, whether his invitation was canceled, is not known.

The court has nothing to do with credibility of the testimony of Marion Roberts, or with credibility of the testimony of Mrs. Beardmore, who was a close friend of Marion, but who belonged to a social set with which Earl did not care to affiliate. None but the testimony favorable to Marion may be considered.

In this instance the situation to be analyzed was brought on the record by Marion's uncandid testimony tending to mislead the court

and jury. She "learned" Martha, whom she had invited, was coming. Then Marion canceled the invitation by a falsehood to Martha. Proceeding with the analysis, there was no testimony for Marion that Earl knew Martha had been invited, or not invited, or that the invitation had been canceled or not canceled, or that Earl knew whether his wife would be at home when he got home, or that anybody else was coming, or not coming. Earl came home after his work for the day was done. His wife was gone. He did not know where she was, or when she might appear, which, so far as he knew, might be any moment. There was no evidence that after her invitation was canceled Martha knew Earl would be at home, and on the face of the record made by Marion, nobody knows, or could conjecture with the slightest degree of probability, how it came about that Martha went to the Roberts' apartment, or why Eresch went there, or went away. Neither Marion nor Mrs. Beardmore gave testimony with respect to the showing of the lights in the apartment at any time that night, and nobody knows, or could conjecture with the slightest degree of probability, what occurred there before or after Eresch went away. Marion saw Martha go to the apartment, knew Martha remained after Eresch left, and could have known just what was going on by walking in.

Nobody knows, or could conjecture with the slightest degree of probability, where Earl and Martha went after leaving the apartment, or how long they were together. One guess might be Martha took Earl to some place to which he wanted to go, and then Martha went home. Counsel for Marion would make another guess. Reasonable inferences from evidence are one thing. Guesses are another. When reasonable but opposing inferences may be drawn from the same testimony, a jury question is presented. But a jury may not choose between guesses, in order to transfer $75,000 of Martha's money to Marion.

The world is censorious, and is titillated by anything which might savor of scandal. But what Mrs. Grundy might say was not the question before the court. The question before the court was narrow and specific, as indicated above; and proof was required of the kind indicated above. The testimony favorable to Marion indicated opportunity for Martha to work on Earl with deliberate purpose to alienate his affection from Marion, but the testimony furnished basis for nothing but guesswork with respect to whether she did so.

The foregoing applies with full force to an incident related by

Marion and Mrs. Beardmore occurring on the night of March 14, 1934. Marion and Mrs. Beardmore were again riding around and around and saw Martha's car go into her garage. They testified Earl was driving the car, but he did not come out, and was not subsequently seen or heard. The three ladies conversed together, there was nothing out of the way in Martha's appearance, and she invited Marion and Mrs. Beardmore into the house, but they did not go. Martha's testimony Earl was not with her is, of course, not considered.

Mrs. Beardmore said she did not see the lights go on in Martha's house. How long or where she waited to see whether lights went on after Martha had gone into the house, is not disclosed, and a conjecture that Earl afterward went into the house is not even plausible.

Marion testified that Earl came home that night about three o'clock and choked her, leaving marks on her throat. What brought on the choking would have involved communication between husband and wife, and is not revealed. In her cross petition in the divorce action Marion made no mention of this choking. She alleged that about February 1, when she was objecting to Earl's association with Martha, he choked her and did other physical violence to her. The acts of February 1 were the only acts of physical violence supporting the divorce decree, and they were not mentioned in the trial of this case.

Marion testified that the next day after Earl choked her she was crying and talking about it in her own home. Margaret Freeman, Duane Freeman and Martha were present. Martha said she did not see why Marion should allow Earl to abuse her that way, could not see how Marion could put up with his staying out nights, running around, and getting drunk, and said if she were in Marion's place she would get a divorce. There was no suggestion it was Martha who was keeping Earl out nights, and when Martha was ready to go home Marion took her home. There is not a syllable of testimony that Marion even intimated the choking might be attributed to what occurred the night before, or to anything else occurring at any time for which Martha might be to blame.

Marion testified the reason she took Martha home was, she wanted to talk to Martha. On the way home Marion told Martha she had already talked to an attorney about getting a divorce. She testified this was not true. She wanted to see how soon Earl would know about it. Martha's denial that any such conversation occurred is of course disregarded.

Marion testified that the same night she took Martha home Earl went out about midnight to put up the car, and did not return until about 9:30 the next morning. Marion then had a conversation with Earl, and testified as follows:

"Q. . . . Without telling the conversation between you and your husband, was there anything said about your having been to see Lundblade? A. Yes, sir."

No objection to the question was interposed, and the answer raises this question: Who opened the conversation about Marion consulting Mr. Lundblade? Nobody knows. Earl was making a practice of staying out at night. The marks of his choking Marion were still on her throat when she took Martha home. Martha had suggested divorce to Marion. Marion talked divorce to Martha. One guess is as good as another, and one guess is, Marion concluded to tell Earl the same falsehood she told Martha. Counsel for Marion would make another guess. Nobody knows what occurred, and guesswork is not permissible. Five days later Earl left.

The attorneys for Martha did not abstract the testimony of Mrs. I. F. Krehbiel, who lived in Columbus, Neb., some 200 miles from the place of trial, and who attended the trial on request, as a witness for Martha. Mrs. Krehbiel qualified, and gave testimony that Marion's reputation for truth and veracity was bad. There was testimony Marion's reputation for truth and veracity was good, which was conclusive on this court in this appeal. For some reason, neither apparent nor made manifest, the attorneys for Marion brought Mrs. Krehbiel's testimony to the attention of the court by counter abstract, devoting almost a printed page to the subject, which concluded with the following candid statements:

"Q. You are a very good friend of Martha Dockstader, are you not? A. I think so, yes.

"Q. Like to see her win this lawsuit, wouldn't you? A. I am here on the side of the defense, yes.

"Q. Yes, and you are doing all you can, aren't you? A. I have done nothing since I have been here to help win this lawsuit. My part is what I am doing now."

Counsel for Martha then completed the testimony of Mrs. Krehbiel.

Mrs. Krehbiel lived in Salina when Marion lived there, before the final residence in Beloit. On an occasion, Mrs. Krehbiel's husband was away. Marion brought two men to Mrs. Krehbiel's house, and the four had dinner together in the evening. Mrs. Krehbiel testified:

"Q. . . . now just tell what you saw with reference to Marion, and what she did, and anyone else did there after dinner that evening? A. Well, we visited around and played the Columbia and danced, and I think played a rubber of bridge.

"Q. Yes. A. And soon Marion left the room and went to the bedroom. There was no light in the bedroom, and in a few minutes M—— B—— left the room also and went to the bedroom.

"Q. Yes. A. There were never any lights came on in the bedroom, but I would say in thirty minutes or so, a light did come on in the bathroom.

"Q. Yes, how long did they remain in there? A. I don't know who went into the bathroom. I said a light came on in the bathroom.

. . . . . . . . . . .

"Q. Now, did you go in the bedroom after they came out? A. After they left the house, I did. . . . I noticed the bed was badly disarranged. . . ."

Whatever the importance which the parties seem to attach to it, none of Mrs. Krehbiel's testimony is taken into account in arriving at a decision.

There was testimony that after Earl left Marion her father got in telephone communication with Earl and asked Earl if Marion had done anything wrong. Earl said "No."

In the foregoing, the important material out of which the fabric of plaintiff's case was woven has been exhibited, up to the time Earl left. Some minor matters have not been referred to. They have all been considered in the light of the law, and no substantial evidence to sustain the cause of action stated in Marion's petition was presented.

Evidence of occurrences subsequent to Earl's permanent separation from Marion on March 20, 1934, was offered to show that Martha had alienated Earl's affection from his wife.

At a time after he had separated from Marion, Earl was at Grand Island, Neb., and apparently was in need of transportation. Marion's brief contains the following:

"She [Martha] also admitted she called him on her way to Grand Island, Nebraska, and she took him from there to Salina, Kansas."

This statement, although approximately true, does not adequately portray the truth, and it is necessary to go to the record to see just what Martha admitted.

Earl called Martha by long-distance telephone to come to Grand Island and get him. She replied she would do so if she could leave the baby, and she would let him know. The next day Martha drove to Grand Island alone. Martha testified she did this after she tried to get Mrs. Daniels to go with her. Mrs. Daniels testified Martha

asked her to go, but she could not, for reasons which are given in the record. Martha had a special reason for asking Mrs. Daniels to go with her, also given in the record. On the way to Grand Island, Martha sent Earl a telegram from Superior, Neb., so he would know she was coming. Earl remembered he received a message from Superior, but did not recall whether it was a telegram or a telephone call. He gave a confused account of the episode. Counsel for Marion say he lied, and it is not the province of this court to deny or to affirm. Martha took Earl from Grand Island to Salina, Kan., arriving there some time in the afternoon. She made some purchases, called on Mrs. Krehbiel, and returned to Beloit, arriving in the evening. That is the record concerning Martha's admission.

Counsel for Marion say if Martha was not pursuing Earl, Martha was furnishing the transportation, a neat bit of persiflage which lightens for the moment the drudgery of search in a barren record for facts to sustain a cause of action.

From Salina, Earl went to Wichita. The date is not clear, but the date assigned by Marion's attorneys, April 11 or 12, may be accepted. Noel Dockstader's sister is the wife of L. M. Kagey, an attorney at law of Wichita, and attorney for Martha in this case. Martha went to Wichita to visit her sister-in-law about April 23. Marion's counter abstract says Marion learned of Martha going to Wichita about the 31st day of April, an impossible date, and the only proof of date is that given by Martha. Marion's brief contains the following:

"He [Earl] later testified he went from there to Wichita. That was about the 11th or 12th of April. Some time elapsed and the court could believe that when the persuasion and inducement of the dashing widow and her resolve to break up the home in which the appellee was so happy began to weaken he needed more persuasion."

The court could not make these conjectures, and does not grasp the happy-home idea, in view of the choking Earl gave Marion on the night of March 14, which she cried about the next day to the Freemans and Martha, or in view of the gross neglect of duty and extreme cruelty for which she obtained a divorce in July. The cross petition in the divorce action contained the following paragraph:

"That after the plaintiff commenced his associations with Martha Dockstader he became sulky and quarrelsome about the home, he would strike and abuse the defendant. That on one occasion about the 1st day of February, 1934, he struck and choked the defendant, upon her objecting to the associa-

tions of the plaintiff with Martha Dockstader, and then deliberately and intentionally stuck a lighted cigarette butt against her breast in such a manner that it caused a very painful burn. Such acts upon the part of the plaintiff were designed, intended to and did wound the feelings of the defendant, caused her to be nervous, so as to utterly destroy the legitimate ends and objects of matrimony."

Marion arrived in Wichita on April 24. The divorce action had been commenced the day before. The brief for Marion contains the following:

"However, the day before the appellee arrived it is a fair inference that the appellant had rekindled the passion of the weakening husband, had renewed his desires, and had reinforced his resolve to such an extent that on the promise which appellee's husband said L. M. Kagey made to him to charge him nothing for the divorce and to keep the name of the appellant out of the proceedings and out of any action, such as this action, by stipulation, he filed his divorce."

There is no testimony in the record that Martha knew the divorce action was to be filed, or was filed the day it was filed. The fulmination dubbed "fair inference" is a fair sample of the inferences proposed in Marion's brief. The phraseology indicating that the divorce action was commenced because L. M. Kagey promised it would cost Earl nothing does not correctly present the record.

Earl testified he was the one who suggested the divorce action be filed in Wichita, and that at the time it was filed L. M. Kagey told him it would not cost him anything. Earl had known L. M. Kagey and had been a very warm friend of Kagey all his life. Earl had known L. M. Kagey's wife all her life. The full explanation, given by L. M. Kagey, of what the financial arrangements were with respect to beginning the divorce suit cannot be considered. In any event, L. M. Kagey is not a party to this action. How L. M. Kagey could keep Martha out is, of course, not explained either in record or brief, and the statement in the brief for Marion that the stipulation would be to keep Martha's name out of any action such as this action, is without any basis in the record.

Some matters relating to Marion's trying to find Earl while in Wichita, after the divorce action had been filed, are too inconsequential to be spread on the pages of the Kansas reports.

The result of the foregoing is, there was no substantial evidence that Martha Dockstader alienated, or was designedly a substantial factor in alienating the affection of Earl Roberts from his wife, before the divorce suit was commenced on April 23, 1934.

There was evidence of correspondence between Martha and Earl after the divorce suit was commenced, which it is urged tends to prove Martha caused Earl to leave his wife.

There is no dispute that Martha conceived a very sincere affection for Earl, which she freely expressed to him in letters. The first letter found in the record appears to have been written May 11 at Beloit, and mailed to Earl at Wichita. Martha was preparing to go to California, and the letter expressed anxiety with respect to whether she would see him before she left. The letter closed as follows:

"I love you, Earl, with all my heart. Forever I will. 'Don't forget.'"

The last letter was mailed from California, September 22, and contained the following:

"I meant to tell you in my last letter if you have to wait quite awhile for an opening of some kind and need a *little* cash right badly, I'll be more than glad to divide up with you—know you would do the same for me."

The last letter closed, as did the first one, with "Don't forget."

Nobody knows to what the words, "Don't forget," referred. Counsel for Marion say they refer to some understanding between Earl and Martha while the marriage relation existed between Earl and Marion. That relation existed until July 11. Permanent separation occurred on March 20.

Whatever the supposed understanding may have been, as if fearful Earl would forget, Martha used the words, "Don't forget" in each letter. Manifestly, she hoped to gain him for herself, but her hope was vain. Within less than a month from the time the divorce from Marion was granted, Earl had forgotten, or was forgetting, and he commenced going with a young woman of Wichita, whom he married shortly after the divorce became absolute.

In October, 1935, Martha came to the trial of this case, with her letters to Earl in Marion's possession. Martha was Marion's first witness, and as such, identified all the letters showing she had lost her heart to the man who, when she took his deposition previous to trial, just could not remember. For example, on an occasion before he separated from Marion, Earl left his house, and came back. A man referred to in the divorce petition roomed in the house. Marion's answer in the divorce case said Earl asked him to leave, and Marion testified in this case Earl had a fight with him. Earl was asked the following question:

"Q. I will ask you if you saw her lying in bed with him, and they had their arms around each other and were kissing each other."

He knew perfectly well whether he saw his wife in the situation described or did not. His answer was, "I don't recall such an instance."

When Martha first commenced to be enamored of Earl on her own account is not disclosed by any fact or circumstance appearing in the record. The brief for Marion indicates Martha's thoughts were of new conquests before the dirt of her husband's grave had settled, but that is too indefinite to be of any assistance to the court. The record has been examined with painstaking care, and whenever Martha commenced to regard Earl as meaning more to her than a close friend, there is no substantial evidence she ever had a settled purpose which she undertook to execute and did execute, to alienate Earl's affection from Marion.

Marion's brief quotes the following from the *per curiam* opinion in the case of *Rumor v. Rumor*, 67 Kan. 822, 72 Pac. 1101:

"Necessarily in such a case very little of direct evidence can be adduced. Much must be left to deduction."

No facts were stated, and the opinion is not helpful, even in its enunciation of principle, since the method of deriving inferences from evidence in a lawsuit is the inductive, and not the deductive method. The difference between inferences of fact properly derived, and suspicion, surmise and guesswork has been adverted to.

Marion's brief contains the following from the opinion in the case of *Davidson v. Douglas*, 129 Kan. 766, 284 Pac. 427:

"From this recital it is clear from the authorities that there was plenty of evidence to go to the jury, notwithstanding the fact that later a part of it was explained or qualified." (p. 769.)

The decision in the Davidson case was based on a long recital of facts which do not bear even remote resemblance to the facts of this case.

Some matters of fact urged in Marion's brief and not referred to, and much innuendo and vituperation have been considered, and will not be discussed.

It was scarcely possible for the district court, at the close of the trial, to make the critical analysis of the evidence which has been made above, and to apply to the evidence the legal principles which have been approved earlier in this opinion.

Actions for damages for alienation of affection and for breach of promise of marriage have become so obnoxious to the public welfare that the legislatures of some states have abolished them. The remedy for alienation still exists in this state, but only subject to the limitations stated in the case of *Powers v. Sumbler*, 83 Kan. 1, 110 Pac. 97. The acts of the defendant must be done knowingly and intentionally, for the purpose of alienating the husband's affection, and must be the controlling cause of alienation.

In the lore of the common people is an aphorism about ascertaining the distance to the moon: Guess at half the distance, and multiply by two. The underlying thought is the basis of the rule of judicial proof forbidding resort to surmise, conjecture and imaginative speculation, to arrive at facts, rejecting plausibility, and forbidding inference of an act from opportunity to commit the act.

Application of the two sound principles just referred to solves this controversy, and it becomes the duty of this court to make final disposition of the case.

The judgment of the district court is reversed, and the cause is remanded with direction to dismiss the action, at the cost of plaintiff.