No. 45,954

Leronzo LaFayette Wilson, *Appellee*, v. J. A. Aylward, *Appellant*.

(484 P. 2d 1003)

Opinion filed May 15, 1971.

*Paul R. Kitch*, argued the cause, and *Gerrit H. Wormhoudt* and *Thomas D. Kitch*, all of the firm of Fleeson, Gooing, Coulson & Kitch, Wichita, and *Walter A. Sawhill*, of Sawhill & Southard, Wichita, were with him on the brief for the appellant.

*Ralph E. Gilchrist*, of the firm of Gilchrist & Buck, Wichita, argued the cause, and *Orval Fisher*, of the firm of Michaud & Cranmer, Wichita, was with him on the brief for the appellee.

The opinion of the court was delivered by

Price, C. J.: Plaintiff brought this action to recover damages in the amount of $200,000 for the alleged alienation of his wife's affections. The case was tried by the court without a jury. Defendant has appealed from a $50,000 judgment.

Highly summarized, the background of the matter is substantially as follows:

Plaintiff, Leronzo LaFayette Wilson, a negro, was a member of the Wichita fire department.

The woman in the case—also a negro—is Evelyn Wilson. She and plaintiff were first married in 1948. They were divorced in 1953. They were remarried in 1959.

Defendant, J. A. Aylward—a white man—was a wealthy Wichita businessman.

In 1957 Evelyn was working as a waitress at a country club in Wichita of which defendant was a member. He was about 65 years of age, and she much younger. They were acquainted. She went to his office seeking a loan of several hundred dollars. The "loan" was made—but never repaid. At her solicitation they met at a Wichita motel on one or two occasions and indulged in sexual intercourse. This was repeated once or twice at defendant's downtown hotel room. In the meantime, Evelyn demanded large sums of money. Defendant paid in cash. The three or four personal "meetings" were in a thirty-day period in 1957—and, as stated—Evelyn and plaintiff were not remarried until 1959.

Under threats of exposure—Evelyn continued her demands for money. On occasions she went to defendant's office to secure it. At other times she sent some one—including her son. In a period of perhaps a year defendant paid her approximately $40,000 in cash. Her demands for money—under threats of exposure—continued—and defendant continued to pay—by checks. Up until 1967 these checks totaled approximately $65,000.

During this ten-year period defendant became somewhat of a mental case—suffering from "depression and severe anxiety reactions bordering on panic". He was hospitalized several times. Finally, through the efforts of his psychiatrist and attorneys, he stopped making payments to Evelyn in 1967—to await "developments".

In the meantime Evelyn had been living "high", and maintained large charge accounts at leading stores in Wichita. In February 1968 she sued plaintiff for divorce and left for California. Although following their remarriage in 1959 plaintiff and Evelyn maintained a joint checking account in a Wichita bank in which she deposited the large sums received from defendant—plaintiff claimed ignorance of the entire matter until he received an alleged anonymous telephone call late at night shortly after Evelyn left for California in which he was told of the "affair" between Evelyn and defendant. The next day he went to defendant's office, identified himself, and demanded $40,000, telling defendant that Evelyn had left Wichita with large unpaid accounts at local stores. Defendant refused, and referred plaintiff to his (defendant's) attorney.

In Evelyn's divorce action against plaintiff, at which she did not appear in person, he was granted a divorce on his cross-petition in November 1968.

This action for alienation of affections was filed in April 1968 and was tried in May 1969.

Other than the oral in-court testimony of plaintiff, the evidence consisted of depositions and affidavits.

In her affidavit Evelyn stated that from 1959 through 1967 she and plaintiff maintained a joint checking account in a Wichita bank; that she deposited in the account the sums of money received from defendant; that at all times plaintiff wrote checks on the account and was aware of the amount in the account and where it came from. She further stated that at no time had she ever received any money from defendant for the purpose of encouraging, inducing or enticing her to leave and divorce plaintiff, and that the grounds of her divorce action against plaintiff were based on plaintiff's intolerable conduct toward her and their children.

Plaintiff denied all knowledge of what had been going on over the ten-year period until he received the anonymous telephone call above mentioned; he was aware of Evelyn's large expenditures during the period but assumed the money had come from her parents, and that right up until the time she sued him for divorce she had been affectionate toward him and "everything was normal". In the course of his cross-examination the following appears in the record:

"Q. In your petition for alienation of affection you have said Mr. Aylward alienated your wife's affection—will you tell the court how he has done this?

"A. Well, in two ways—I would think the fact that he first approached her with large sums of money and she told me at first this is the only reason she started messing with him because of the money he was giving her, and second, because they had gone to bed together—he admits it, so does she.

"Q. That is the kind of arrangements you make with a prostitute, isn't it?

"A. Take it any way you want it—it happened.

"Q. Is there any other reason that you believe Mr. Aylward alienated the affections of your wife toward you?

"A. I believe he is responsible for her leaving here and leaving me." (p. 74)

The testimony of defendant's physician-psychiatrist has been referred to.

The testimony of defendant need not be detailed. In it he admitted the three or four meetings with Evelyn during the thirty-day period back in 1957; admitted the payments made over the ten-year period, and stated that all payments were the result of threats of exposure and humiliation to him and his family.

In its decision the trial court—after reciting generally the facts as above related—found that plaintiff was innocent throughout the

whole affair; that defendant's conduct was wrongful and willful and in derogation of plaintiff's marital rights; that Evelyn could not have moved herself and children to California except for the financial help furnished by defendant over the period in question, and that plaintiff had suffered loss of marital affection and companionship of his children through the wrongful influence of defendant. The court further found—

"This evidence does have a bearing on the element of damage sustained by plaintiff, but when the entire case is considered the court reaches the conclusion that it was not the personal magnetism or physical attraction of the defendant but rather the money that he so generously bestowed upon Evelyn Wilson that constituted the wrongful and wilful conduct of defendant that ultimately resulted in the situation in which plaintiff now finds himself.

"There is no evidence in the record and the court can find none by direct evidence or by implication that the plaintiff has been at fault or been involved in the sordid affair disclosed by the evidence. There is no evidence or implication that the wife of plaintiff voluntarily bestowed her love and affection on defendant, absent the influence of his wealth.

"The court finds defendant's conduct, as disclosed by the evidence, to be an improper, wilful and malicious influence in derogation of plaintiff's marital rights and the active, controlling cause of the loss sustained by plaintiff." (p. 114)

and rendered judgment for $50,000.

Before discussing further the facts of this case we refer to what has been said by this court on the subject of actions for alienation of affections.

In *Powers v. Sumbler*, 83 Kan. 1, 110 Pac. 97, it was held:

"In an action by the wife against a stranger to recover damages for the alienation of the affections of her husband the court correctly charged that in order for the plaintiff to recover it was necessary to show that it was the efforts of the defendant which were the controlling cause that destroyed the affection which the plaintiff's husband had for her and caused their separation, and that the acts of the defendant were done knowingly and intentionally, for the purpose of alienating the husband's affections." (Syl. 3)

"In an action by the wife against a stranger to recover for alienation of the affections of her husband an instruction which omits the qualification that the defendant must have acted knowingly and intentionally was properly refused." (Syl. 4)

In *Roberts v. Dockstader*, 144 Kan. 384, 61 P. 2d 114, it was said:

"Actions for damages for alienation of affection and for breach of promise of marriage have become so obnoxious to the public welfare that the legislatures of some states have abolished them. The remedy for alienation still exists in this state, but only subject to the limitations stated in the case of

*Powers v. Sumbler,* 83 Kan. 1, 110 Pac. 97. The acts of the defendant must be done knowingly and intentionally, for the purpose of alienating the husband's affection, and must be the controlling cause of alienation." (p. 402)

In *Curry v. Kline,* 187 Kan. 109, 353 P. 2d 508, the rule of the *Powers* and *Roberts* cases was followed, and it was said:

"To enable a plaintiff to maintain an action of this nature it is necessary he allege and prove that the defendant was the active, controlling cause of the loss of the wife's love and affection and that the defendant exercised an improper, willful and malicious influence in derogation of the plaintiff's marital rights. The reason is obvious. Actions for alienation of affection have been subject to grave abuses and have been used as instruments for blackmail by unscrupulous persons for their unjust enrichment, due to the indefiniteness of the damages recoverable and the consequent fear of persons threatened with such actions that exorbitant damages might be assessed against them. The purpose for the rule is to stop the attempt by some to use the courts as a means to exact payment when the defendant's acts were not the real or controlling cause of the alienation." (p. 111)

Without further elaboration of the details of this sorry mess— the entire picture is clear. The "morals" of the affair during the thirty-day period in 1957 when Evelyn was unmarried—of course are not to be condoned—but, for purposes of the precise questions presented—are beside the point. Immediately thereafter—and extending to 1967—the undisputed evidence is that defendant was threatened with exposure and humiliation to him and his family— unless he met her demands for money. He complied—to the tune of over $100,000!

Even though plaintiff be considered as innocent throughout the entire affair—as found by the trial court—he still is not relieved of the burden of establishing that defendant's conduct was the controlling cause that destroyed Evelyn's affection for him, and that the acts of defendant were done knowingly and intentionally for the purpose of alienating her affections. There is not one word of evidence to establish any such design—in fact, all is to the contrary. Her only concern was money—defendant's only concern was silence as to his 1957 indiscretions. Except for the occasions when she came to his office—for money—and chance meetings on the street—there was no personal contact between them following the thirty-day period in 1957.

Regardless of the label given to this bizarre affair—and whether it be denominated as blackmail, extortion or just a pure-and-simple "shakedown"—the situation presented is a good illustration of what this court may have had in mind in 1936 when in the *Roberts* case,

above, it classified actions for alienation of affections as being obnoxious to the public welfare.

In view of our conclusion, other matters in the briefs require no discussion.

The judgment is reversed with directions to enter judgment for defendant.