Brett W. **NELSON,** Plaintiff and Respondent,

v.

Jeff **JACOBSEN,** Defendant and Appellant.

No. 17667.

Supreme Court of Utah.

Aug. 31, 1983.

Craig M. Snyder, Provo, for defendant and appellant.

K.L. McIff, Richfield, for plaintiff and respondent.

OAKS, Justice:

In a bench trial of this action for alienation of a wife's affections, the plaintiff husband obtained a judgment of $84,600 against a defendant who was unrepresented by counsel. On appeal, defendant seeks judgment notwithstanding the verdict or a new trial.

Plaintiff and Brenda Nelson were married July 15, 1978. He was 21 years old; she was 18. They lived in Salina. From the beginning, their marriage was characterized by turmoil and violence. Brenda testified that plaintiff frequently came home drunk and abused her physically and verbally. His heavy drinking led to numerous confrontations with the police, including two arrests for drunk driving. She also

drank. Within two months of marriage, and long before either party knew defendant, plaintiff told Brenda he wanted a divorce.

Brenda Nelson first met defendant in the fall of 1978 in the Safari Motel and Cafe, which defendant managed for his parents. Defendant, who had been divorced, was then 31. Plaintiff met defendant in January 1979. The three became friends.

Brenda initiated most of the contact between herself and defendant. She first made sexual advances toward him at a party in January 1979, but they were unreciprocated at that time. In the next six months, she frequently visited defendant at his home in Axtell, "depend[ing] on [plaintiff's] work schedule," and she and defendant sometimes drove around together in her truck.

Plaintiff first became aware of Brenda's involvement with defendant in early June 1979. Twice he came home early from his night shift at the coal mine and discovered them together. The second discovery gave rise to a discussion that ultimately involved both spouses' parents, during which Brenda admitted seeing defendant and promised to stop. In late June, she talked with defendant at a beer party. Seeing this, plaintiff dragged her behind his truck and began beating her. When defendant intervened, a fight ensued between plaintiff and defendant in which plaintiff was injured.

Plaintiff quit the coal mine in July and took a job with a trucking company in order to spend more time with Brenda. About three weeks later, Brenda asked him to give her 17-year-old friend a ride home to Richfield on his way to work the night shift. Rather than driving the girl home, plaintiff bought four six-packs of beer, which the two drank as they drove around in his company truck. Plaintiff made sexual advances toward her. The two were seen together, and when plaintiff arrived at work he was summarily fired for drinking and having an underage passenger in his truck. Returning home late that night, still very drunk, he awakened Brenda with his shouting and cursing. While repeatedly pegging his hunting knife into the floor, he threatened to break every bone in her body if she didn't call her father to come for her. Brenda went to stay with her parents for a week. When the couple reconciled, Brenda's father counseled them both to stop drinking if they wanted to save their marriage.

Plaintiff's parents testified that plaintiff became despondent and withdrawn after he discovered Brenda's involvement with defendant, and that his drinking also increased. After being fired, plaintiff worked irregularly driving trucks for various construction companies, but he was unemployed for lengthy periods, and his income fell to half of its prior level.

In August 1979, Brenda told plaintiff she wanted time to think about their marital problems. She persuaded defendant to take her with him to Las Vegas, where they stayed overnight. Defendant testified that Brenda slept in a motel while he gambled all night in a casino. (Defendant testified that his relationship with Brenda did not become romantic until several months after plaintiff and Brenda were divorced, October 31, 1979.)

Upon her return, Brenda told plaintiff she thought they could make their marriage work, and they continued to live together. In late August, in response to plaintiff's questioning, Brenda admitted that she and defendant had had sexual intercourse "probably around" eight to twelve times. Enraged, plaintiff gave her an especially vicious beating. Injured and suffering, Brenda went to defendant's home for a few days and then to her parents'.

Within a week, Brenda returned to plaintiff and agreed to try again to make the marriage work on condition that the drinking and beating stop. However, she testified, plaintiff's promises were not kept and after many attempts to mend her marriage she finally left plaintiff because of his drinking and his physical abuse of her.

Plaintiff testified that although Brenda came back to him in September, she seemed "as if she had given up" on the marriage.

In October 1979, the couple fought at a party when Brenda discovered plaintiff in the kitchen with another woman. Later that month, Brenda moved out for the last time and went to live with defendant. They were married October 1, 1980.

Plaintiff commenced this action on September 27, 1979. Defendant had only a limited education and no prior experience in legal proceedings. On the recommendation of a friend, he retained a Salt Lake City attorney to represent him. Defendant paid this attorney a retainer of $500 and an additional $6,500, which the attorney said he would hold in trust to pay additional attorney fees and to negotiate a settlement. The remainder was to be refunded to defendant. Between March and July 1980, the case was set for trial then changed to a pretrial hearing, which was twice vacated and rescheduled while the parties attempted to negotiate a settlement. After reaching a tentative settlement, the parties stipulated on July 29, 1980, to a dismissal of plaintiff's complaint with prejudice. This dismissal was entered. Defendant's attorney advised that the settlement amount was $5,000 and asked defendant to send the money. When asked why he did not pay this amount out of the trust fund, the attorney replied that his legal fees had depleted almost the entire $7,000 previously paid. Defendant protested that he did not have an additional $5,000. The attorney told him he would not continue to represent him without payment of additional attorney fees to cover the cost of trial, but that if defendant would discharge him he would refund $1,300 from the trust fund. The attorney also advised that defendant could settle the case himself either by giving plaintiff a promissory note for the $5,000 settlement amount or by negotiating his own settlement.

Defendant dismissed his attorney and demanded delivery of his file in the case, including copies of all correspondence and pleadings and the depositions of both plain-

tiff and defendant. Defendant represents that his attorney never sent him the case file and that the attorney did not advise him concerning his rights as a litigant, the risks of representing himself, or the possible consequences of the attorney's withdrawal. The attorney withdrew with court approval in early September 1980 and refunded $1,300 to defendant.

No further proceedings were initiated by either party for a period of four months, during which defendant neither executed a note nor paid plaintiff any money toward the settlement. Thereafter, the settlement agreement having failed, plaintiff petitioned the district court to set aside its earlier order of dismissal, reinstate the action, and set it for nonjury trial. Having been duly notified, defendant attended the hearing without counsel. The petition was granted, and the case was set for nonjury trial two weeks later.

The case was tried on January 21, 1981. Defendant attempted to represent himself at trial. The total judgment taken against him was $84,600: $59,600 for past and future loss of consortium and $25,000 in punitive damages. Defendant's timely motions for a new trial and for judgment notwithstanding the verdict were both denied, and this appeal followed.

## I. FAIRNESS OF TRIAL

Defendant contends that his motion for a new trial should have been granted because he was denied due process of law in the proceedings by not being given adequate and timely notice of trial.[1]

■ Timely and adequate notice and an opportunity to be heard in a meaningful way are the very heart of procedural fairness. *Worrall v. Ogden City Fire Department,* Utah, 616 P.2d 598, 601–02 (1980); *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). The much-cited case of *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70

---

1. Defendant also urges error in plaintiff's failure to give him the statutory notice either to appoint another attorney or appear in person.

U.C.A., 1953, § 78–51–36. In the view we take of this case, we need not reach that contention.

S.Ct. 652, 657, 94 L.Ed. 865 (1950), sets out the classic requirements of adequate notice:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance. [Citations omitted.]

Many cases have held that where notice is ambiguous or inadequate to inform a party of the nature of the proceedings against him or not given sufficiently in advance of the proceeding to permit preparation, a party is deprived of due process. *Graham v. Sawaya,* Utah, 632 P.2d 851 (1981); *Uhler v. Secretary of Health & Mental Hygiene,* 45 Md.App. 282, 412 A.2d 1287 (1980); *Myers v. Moreno,* Mo.App., 564 S.W.2d 83 (1978).

Applying these standards to the record in this case, we conclude that the notice of trial was constitutionally deficient as to this unrepresented defendant because it described the nature of the proceedings against him in such ambiguous terms that it deprived him of adequate time to prepare his defense.

Plaintiff's petition to set aside the earlier dismissal and reinstate the lawsuit was filed on December 26, 1980. The petition was heard on January 7, 1981. Defendant was present in the courtroom without counsel; plaintiff's counsel was temporarily absent. The record of the hearing reads as follows:

> The Court: We are now on Civil 7928, *Nelson vs. Jacobsen.* Is [plaintiff's counsel] here?
>
> The Clerk: No, Your Honor.
>
> The Court: Well, I'm going to set this case *for hearing* on January 21st at 10:00 a.m., following the Law and Motion matters. You notify [plaintiff's counsel] accordingly. [Emphasis added.]

The district court then proceeded to other cases, and defendant left the courtroom.[2] The minute entry, dated January 8, 1981, states that "[p]laintiff's motion is granted and this matter is set for hearing on Jan. 21st, 1981, to follow the Law and Motion Calendar as a non-jury trial." But there is no indication in the record that defendant ever saw or received a copy of the minute order. Hence, we must assume that the only notice defendant received at this time was the district court's oral statement that the case had been set for "hearing" two weeks later.

The order of reinstatement scheduling the case for trial on January 21 was executed January 14 and mailed to defendant January 15, 1981. On that same day, the court clerk sent defendant a separate notice that the matter was set for trial six days later. Defendant received the order and the notice on January 19, just two days before trial. The record indicates that the receipt of these documents constituted defendant's first notice that the January 21 event was to be a full-scale "trial," rather than a "hearing." Exactly two weeks after the lawsuit was reinstated and two days after he received notice of the date of trial, the case went to trial. Defendant represented himself. The court awarded a judgment against defendant for $84,600.

---

**2.** Approximately twenty minutes later, plaintiff's counsel entered the courtroom, and the following transpired:

  [Plaintiff's counsel]: Your Honor, I was outside. Did you set 7928, Nelson v. Jacobsen?
  The Court: Did I set that one, Carole?
  The Clerk: Yes, Your Honor. You set it for January 21st.
  [Plaintiff's counsel]: Well, I wasn't here so I didn't know.

  The Court: I set the matter for January 21st at 10:00 a.m. to follow the Law and Motion matters. [To the clerk] [W]ill you please notify the Defendan., of this hearing so he will know that the matter is set.
  The Clerk: I think his counsel has been dismissed.
  The Court: Well, then notify him at his address in Salina, or wherever he lives.

■ "To satisfy an essential requisite of procedural due process, a 'hearing' must be prefaced by timely notice which adequately informs the parties of the specific issues they must prepare to meet." *State v. Gibbs,* 94 Idaho 908, 914, 500 P.2d 209, 215 (1972). In cases where the notice is ambiguous or misleading, courts have found a denial of due process. In *Watson v. Washington Preferred Life Insurance Co.,* 81 Wash.2d 403, 502 P.2d 1016 (1972) (en banc), notice of a shareholders' meeting "[t]o consider and vote upon a plan and agreement of merger ... [and to] transact ... other business" was held constitutionally inadequate and violative of due process because it failed to inform shareholders that those not receiving the mailed notice would be treated as "missing shareholders" and that, should they fail to appear at the shareholders' meeting, the court would appoint, ex parte, a representative to vote their shares. 502 P.2d at 1020. Similarly, in *City and County of Denver v. Eggert,* Colo., 647 P.2d 216 (1982) (en banc), the Colorado Supreme Court held violative of due process notice of a "hearing ... to allow information regarding [a] landfill operation to be made public in the interests of the health, safety, and welfare of [the county's] citizens" where it was clear from the record that the plaintiff-city and its contractors "had no idea that the result of the hearing would be a cease and desist order effective almost immediately" against them. 647 P.2d at 223–24. Finally, in *State v. Gibbs, supra,* the court held that an order waiving juvenile jurisdiction and binding the juvenile over for trial as an adult violated the juvenile's due process rights where it resulted from notice which contained only allegations of the juvenile's unlawful acts and made no mention that a primary purpose of the "interviews" with a magistrate was to determine whether juvenile jurisdiction should be waived.

■ "Due process" is not a technical concept that can be reduced to a formula with a fixed content unrelated to time, place, and circumstances. Rather, "the demands of due process rest on the concept of basic fairness of procedure and demand a procedure appropriate to the case and just to the parties involved." *Rupp v. Grantsville City,* Utah, 610 P.2d 338, 341 (1980).

■ To a member of the bar or even to a layperson experienced with trial proceedings, setting a case for "hearing" could have been understood as setting a case for "trial." But to this uneducated and inexperienced defendant, a setting for "hearing" was not a clear notice that the defendant had to be ready for trial on that date. Indeed, defendant had earlier attended one "hearing" in which plaintiff's petition to reinstate was granted without evidence or discussion, without requiring that plaintiff or his counsel be present and without requiring any participation by defendant. Based on his experience at this earlier hearing, defendant could reasonably have concluded that the "hearing" set for January 21 would also be routine.

■ Defendant was entitled to undertake his own representation. U.C.A., 1953, § 78–51–25; *Heathman v. Hatch,* 13 Utah 2d 266, 268, 372 P.2d 990, 991 (1962). As a general rule, a party who represents himself will be held to the same standard of knowledge and practice as any qualified member of the bar, *Manka v. Martin,* 200 Colo. 260, 614 P.2d 875, 880 (1980) (en banc), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1354, 67 L.Ed.2d 338 (1981); *Johnson v. Aetna Casualty & Surety Co.,* Wyo., 630 P.2d 514, 517, *cert. denied,* 454 U.S. 1118, 102 S.Ct. 961, 71 L.Ed.2d 105 (1981); *Smith v. Rabb,* 95 Ariz. 49, 53, 386 P.2d 649, 652 (1963).

At the same time, we have also cautioned that "because of his lack of technical knowledge of law and procedure [a layman acting as his own attorney] should be accorded every consideration that may reasonably be indulged." *Heathman v. Hatch,* 13 Utah 2d at 268, 372 P.2d at 991. Reasonable consideration for a layman acting as his own attorney does not require the court to interrupt the course of proceedings to translate legal terms, explain legal rules, or otherwise attempt to redress the ongoing consequences of the party's decision to function in a capacity for which he is not trained. Judges cannot be expected to perform that

function. In this case, the trial judge was as considerate and helpful as he could be expected to be during the course of the trial.

The deficiency in this case concerns what happened before the trial. The vulnerability of a layman who is unrepresented as he approaches a trial of the legal and factual complexity of this case requires more judicial consideration than was extended here. Most importantly, defendant was not clearly informed of the date of trial until two days before it was to begin. That deficiency jeopardized one of the most important ingredients of due process: time to prepare a defense. In addition, in view of the nature of this action the court should have advised the defendant prior to trial of his right to a trial by jury. And, in view of the fact that defendant had previously been represented by retained counsel whom he had discharged, the court might also have taken steps to assure that defendant was advised of his right to require that counsel to provide the case file and other documents whose preparation had been covered by the prior representation. In this case, plaintiff's counsel repeatedly used defendant's deposition to impeach him during trial. Defendant apparently had no copy of that deposition or of his former counsel's deposition of plaintiff for study prior to the trial.

In all the circumstances of this case, we conclude that it was fundamentally unfair to put defendant to trial on January 21 without counsel and without the other pretrial advice described here. The judgment must therefore be reversed and the cause remanded for a new trial.

## II. CAUSE OF ACTION FOR ALIENATION OF AFFECTIONS

Most of the briefing on this appeal concerns the issue posed by the motion for judgment notwithstanding the verdict. Defendant urges us to abolish the cause of action for alienation of affections. We rule on this issue for the guidance of the district court on remand. Notwithstanding the public policy grounds defendant advances, we choose to retain this cause of action for the reasons and with the limitations outlined below.

We have had no occasion for an in-depth consideration of the common-law cause of action for alienation of affections for nearly thirty years. During that time, as defendant notes, this cause of action has fallen from favor and has been abolished or restricted in a majority of jurisdictions. Eighteen states and the District of Columbia have abolished this cause of action by statute.[3] Two other states have abolished it by judicial decision.[4] Six jurisdictions have statutes abolishing the cause of action for money damages at law, but permitting suits for injunctive relief in equity.[5] The statutes of two additional states have abolished the cause of action for alienation of affections with only insignificant exceptions.[6] The appellate courts of three other

---

3. Ariz.Rev.Stat.Ann. § 25–341 (Supp.1982–1983); Cal.Civ.Code § 43.5 (West 1982); Colo. Rev.Stat. § 13–20–202 (1973); Conn.Gen.Stat. § 52–572b (1983); Del.Code Ann. tit. 10, § 3924 (1974); D.C.Code § 16–923 (Supp. 1978); Ga.Code Ann. § 30–109.1 (1980); Ind. Code Ann. § 34–4–4–1 (Burns Supp.1982); Me. Rev.Stat.Ann. tit. 19, § 167 (1964); Md.Cts. & Jud.Proc.Code Ann. § 5–301(a) (1980); Mich. Comp.Laws Ann. § 600.2901 (1968); Minn. Stat. § 553.02 (1982); Mont.Code Ann. § 27–1–601 (1981); Nev.Rev.Stat. § 41.380 (1979); Or. Rev.Stat. § 30.840 (1981); Va.Code § 8.01–220 (1950); W.Va.Code § 56–3–2A (Supp.1983); Wis.Stat.Ann. § 768.01 (West 1980); Wyo.Stat. Ann. § 1–23–101 (1977).

4. *Fundermann v. Mickelson,* Iowa, 304 N.W.2d 790 (1981); *Wyman v. Wallace,* 94 Wash.2d 99, 105, 615 P.2d 452, 455 (1980).

5. Ala.Code § 6–5–331 (1975) (injunction permitted, *see Logan v. Davidson,* 282 Ala. 327, 330, 211 So.2d 461, 463 (1968)); Fla.Stat. § 771.01 (1981); N.J.Stat.Ann. § 2A:23–1 (West 1952); N.Y.Civ. Rights Law § 80–a (McKinney 1976); Ohio Rev.Code Ann. § 2305.29 (Page 1981); Vt.Stat.Ann. tit. 15, § 1001 (Supp.1983).

6. Okla.Stat.Ann. tit. 76, § 8.1 (West Supp. 1982–1983) (action permitted only if spouse was incompetent or minor at time of alleged alienation); Pa.Stat.Ann. tit. 48, § 170 (Purdon 1965) (action permitted if defendant is blood relative of plaintiff).

states have voiced their dissatisfaction with the cause of action,[7] and three others have enacted legislation shortening their statutes of limitation to one year.[8] Louisiana has never recognized this cause of action.[9] We note that with but two exceptions, when this cause of action has been abolished it has been by legislative rather than judicial action.

■ Defendant argues that a cause of action for alienation of affections is based on the obsolete and fictitious assumptions that "the wife is one of the husband's chattels, and that her companionship, her services and her affections are his property." *Moulin v. Monteleone,* 165 La. 169, 175, 115 So. 447, 450 (1927). While the archaic notion of "wife as chattel" may have served as the historical foundation for this cause of action, its modern content bears little resemblance to that notion. The right to recover for alienation of affections now extends to both spouses equally. *See, e.g., Heist v. Heist,* 46 N.C.App. 521, 265 S.E.2d 434 (1980); *Burch v. Goodson,* 85 Kan. 86, 116 P. 216 (1911). Moreover, an action for alienation of affections is no longer based on the premise that either spouse constitutes the "property" of the other, but on the premise that each spouse has a valuable interest in the marriage *relationship,* including its intimacy, companionship, support, duties, and affection. Note, "The Case for Retention of Causes of Action for Intentional Interference with the Marital Relationship," 48 *Notre Dame Law.* 426, 430–31 (1972).

The law protects, many relational interests. L. Green, "Basic Concepts: Persons, Property, Relations" in *The Litigation Process in Tort Law* 413, 418–24 (1965). We have recently recognized a plaintiff's right to recover for the loss of prospective economic relations. *Leigh Furniture & Carpet Co. v. Isom,* Utah, 657 P.2d 293 (1982). We recognize a cause of action against a defendant who intentionally interferes with a contractual relation. *Bunnell v. Bills,* 13 Utah 2d 83, 90, 368 P.2d 597, 602 (1962) (inducing breach); *Restatement (Second) of Torts* § 766 (1977). Our wrongful death statutes have long recognized the value of a plaintiff's interest in his or her relationships with family members. U.C.A., 1953, §§ 78–11–6, 78–11–7. We have repeatedly sustained a plaintiff's right to recover for "the loss of society, love, companionship, protection and affection which usually constitute the heart of the action." *Jones v. Carvell,* Utah, 641 P.2d 105, 108 (1982). *Accord, In re Behm's Estate,* 117 Utah 151, 159–60, 213 P.2d 657, 661 (1950).[10] The marital relationship is entitled to as much protection as these.

■ Second, defendant contends that there is no proof that an action for alienation of affections achieves its intended purpose of protecting and preserving the marriage. In contrast, he argues, "the very nature of the action serves as a destructive influence on the marriage." This argument misperceives the purpose of the action. It makes little sense to speak of actions growing out of injuries to relations as intended to "preserve" or "protect" those relations.

---

7. *Ferriter v. Daniel O'Connell's Sons, Inc.,* 381 Mass. 507, 1980 Mass.Adv.Sh. 2075, 413 N.E.2d 690, 694 (1980) (action disfavored); *Dube v. Rochette,* 110 N.H. 129, 130, 262 A.2d 288, 289 (1970) (susceptible to abuse but legislative judgment to allow action respected); *Thompson v. Chapman,* 93 N.M. 356, 358, 600 P.2d 302, 304 (N.M.Ct.App.1979) (court would abolish tort if it had authority to do so).

8. Ark.Stat.Ann. § 37–201 (Supp.1983); Ky. Rev.Stat. § 413.140(1)(c) (Supp.1982) (includes alienation action, *see Skaggs v. Stanton,* Ky.Ct. App., 532 S.W.2d 442, 443 (1975)); R.I.Gen. Laws § 9–1–14 (Supp.1982).

9. *Moulin v. Monteleone,* 165 La. 169, 115 So. 447 (1927); *Ohlhausen v. Brown,* La.Ct.App., 372 So.2d 787, 788 (1979).

10. The value of affection in such familial relationships was even recognized implicitly by a court that abolished a cause of action for alienation of affections between spouses. Despite its strident language on the abolition, the court expressly retained a cause of action for alienating the affections of a child. *Wyman v. Wallace,* 15 Wash.App. 395, 400 & n. 4, 549 P.2d 71, 74 & n. 4 (1976), *aff'd,* 94 Wash.2d 99, 615 P.2d 452 (1980) (after initially reversing in 91 Wash.2d 317, 588 P.2d 1133 (1979)).

Actions for intentional interference with prospective economic relations or for inducing breaches of contract are not intended to reestablish those relations or reinstate those contracts but to compensate plaintiffs for their loss. Actions for wrongful death obviously do not restore the plaintiffs' relationships with the deceased; the law seeks only to compensate for losses. Similarly, a suit for alienation of affections does not attempt to "preserve" or "protect" a marriage from interference, but only to compensate a spouse who has suffered loss and injury to his or her marital relationship through the intentional interference of a third party.

Third, defendant contends that the threat of an action for alienation of affections is a powerful tool of extortion since "there exists such potential to damage reputations" that at least one court and one commentator have characterized alienation actions as "legalized blackmail." *Wyman v. Wallace,* 15 Wash.App. 395, 397, 549 P.2d 71, 72 (1976), *aff'd,* 94 Wash.2d 99, 615 P.2d 452 (1980); M. Grossman, *The New York Law of Domestic Relations* § 313 (1947). While it cannot be gainsaid that many types of litigation place private facts in a public light, an action for alienation of affections is no more "extortive" in this sense than an action for criminal conversation, which has adultery as its operative element, *Cahoon v. Pelton,* 9 Utah 2d 224, 231, 342 P.2d 94, 98–99 (1959), or a suit to change the custody of children on the basis of the parental deficiencies of the custodian, or a defamation action in which the defense of truth puts the plaintiff's reputation in question. *See, e.g., Crellin v. Thomas,* 122 Utah 122, 247 P.2d 264 (1952). If, as defendant claims, it is "[g]reed, revenge, spite and a desire to humiliate others" that encourages a plaintiff to sue for alienation of affections, the plaintiff must surely be dissuaded to some extent by the knowledge that his or her own foibles, failures, and inadequacies as a marital partner may be given public exposure by a defendant seeking to disprove causation or to mitigate damages.

■ In any case, even if some alienation actions are motivated primarily by spite or extortion, that is no basis on which to abolish the cause of action altogether.

First, the very purpose of courts is to separate the just from the unjust causes; second, if the courts are to be closed against actions for ... alienation of affections on the ground that some suits may be brought in bad faith, the same reason would close the door against litigants in all kinds of suits, for in every kind of litigation some suits are brought in bad faith; the very purpose of courts is to defeat unjust prosecutions and to secure the rights of parties in just prosecutions ....

*Wilder v. Reno,* 43 F.Supp. 727, 729 (D.Pa. 1942). It is noteworthy that our research has disclosed only one case in which there was evidence that the plaintiff and the "alienated" spouse colluded for purposes of extortion, and in that case recovery was denied. *Wilson v. Aylward,* 207 Kan. 254, 484 P.2d 1003 (1971).

In truth, "procedural limitations and judicial discretion have been deemed adequate safeguards against abuse in other areas of the law vulnerable to bogus claims," and "[t]here is no reason to assume that they cannot be used to similar advantage in this area." Note, 48 *Notre Dame Law., supra,* at 430. Moreover, the courts will not tolerate waste or abuse of judicial resources, and a plaintiff who institutes a groundless or collusive suit is subject to a suit or counterclaim for abuse of process or malicious prosecution. *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d at 308–09; W. Prosser, *Handbook of the Law of Torts* §§ 120, 121 (4th ed. 1971). Finally, abolishing a cause of action for alienation of affections will not eliminate or even reduce extortion (which can still be accomplished by threatening to expose a person to his family or colleagues or publicize his indiscretions in other ways), but it will surely close the courthouse doors to at least some deserving plaintiffs.

■ Defendant's contention that an action for alienation can be used to victimize

innocent and unsuspecting defendants is answered by the fact that this is an intentional tort. There can be no recovery against a defendant whose conduct is blameless or merely negligent (such as a person who is not aware that the object of his or her attentions is married). On the other hand, the element of intent can be proved where the defendant's actions are the product of choice. *See* Note, 48 *Notre Dame Law.*, *supra*, at 431. In fact, where a defendant has actual notice of the marriage, his or her continued overtures or sexual liaisons can be construed as something akin to assumption of the risk that this conduct will injure the marriage and give rise to an action.

■ Fourth, relying on *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), defendant contends that "an alienation of affections action unreasonably, and perhaps unconstitutionally, interferes with and impinges upon [a] defendant's right of privacy ... in the area of personal and sexual relationships between individuals." This argument is misplaced for two reasons. *Griswold* and *Eisenstadt* are inapposite because sexual relations are not a necessary element of alienation of affections. *Cahoon v. Pelton*, 9 Utah 2d at 231, 342 P.2d at 98–99; *Trainor v. Deters*, 22 Ohio App.2d 135, 139–40, 259 N.E.2d 131, 135 (1969). Second, while both *Griswold* and *Eisenstadt* were said to involve "unwarranted *governmental* intrusion" into sexual relations and reproductive choices, *Eisenstadt*, 405 U.S. at 453, 92 S.Ct. at 1038 (emphasis added), a cause of action for alienation of affections involves interference by a *private individual*. As between two private individuals, defendant's claim to sexual and reproductive privacy can be no greater than plaintiff's, and neither can claim constitutional immunity to use his or her own "rights" to invade the "privacy" of the other.

Fifth, defendant urges us to abolish all actions for alienation because it is difficult to determine the intangible injuries involved. Since there is no standard of measurement for the trier of fact, defendant argues, judgments in this area of the law are frequently arbitrary and excessive. But the injury in this action seems no more "intangible" and no more difficult to value than pain and suffering in a personal injury action or the loss of comfort, society, and companionship in an action for wrongful death. The emerging law of intentional infliction of emotional distress attests to the law's willingness to have juries and judges put monetary values on psychic and emotional harm. *See, e.g., State Rubbish Collectors Association v. Siliznoff*, 38 Cal.2d 330, 337–39, 240 P.2d 282, 286 (1952) (en banc) (Traynor, J.).

■ It would be anomalous and unjust to deny recovery where the *fact* of injury or loss can be proved simply because there is difficulty in assessing its *amount*. *Cf. Cook Associates, Inc. v. Warnick*, Utah, 664 P.2d 1161, 1165–66 (1983) (lost profits from new business venture). In *Jones v. Carvell*, Utah, 641 P.2d 105 (1982), we discussed the application of this principle to the recovery of damages for wrongful death, concluding as follows:

> To be sure, the making of such judgments is not easy and requires great understanding of those human values which can make interpersonal relationships so precious. Yet, the process, difficult as it is, must be tempered and confined so as to strike a just balance. The process is not unique to wrongful death cases.

*Id.* at 108. The rule that affirms the availability of a cause of action despite uncertainties in the assessment of damages is of course implemented in the context of appropriate jury instructions and the court's power to require remittitur to restrain or reduce arbitrary or excessive jury verdicts. Utah R.Civ.P. 59(a)(5); *Cahoon v. Pelton*, 9 Utah 2d at 227, 342 P.2d at 95; *Ruf v. Association for World Travel Exchange*, 10 Utah 2d 249, 351 P.2d 623 (1960); *Tice v. Mandel*, N.D., 76 N.W.2d 124 (1956).

Defendant's final argument is both more subtle and more persuasive. He contends that the only marriages which are vulnerable to the depradations of a third party are those in which there is already discord from

other causes. He cites the difficulty of proving causation in actions for alienation of affections. He then concludes that where the alienation is attributable to any significant degree to the plaintiff's own conduct or to the conduct of the alienated spouse, it would be unjust to permit the recovery of damages from a third party.

While conceding the difficulty of proving causation, we conclude that it would be unjust to refuse to try to measure the effect of a third party's intrusion in a marriage just because the parties to the marriage share some of the responsibility for its demise. Even relatively "good" marriages have intermittent difficulties upon which a predatory defendant might capitalize. And even where spouses are estranged, there is merit to the argument that "each has a right to seek a rapprochement that should be protected against those who would cut it off." Note, 48 *Notre Dame Law., supra,* at 432. We are unwilling to adopt a rule of law that would foreclose all remedies on the questionable assumption that any plaintiff whose marriage has gone aground "must have deserved it." We prefer to consider the state of the marriage and the actions of both spouses as relating to causation and damages.

We outlined such an approach in the leading case of *Wilson v. Oldroyd,* 1 Utah 2d 362, 267 P.2d 759 (1954). There, in discussing the element of causation, we stated:

> If the acts or conduct of the plaintiff himself, or any other cause than the acts of the defendant constituted the *controlling cause* ... of plaintiff's loss of affections, then he could not recover, and ... the same would be true "if the plaintiff's wife fell in love with defendant without any affirmative inducement or encouragement from the defendant ...." [Emphasis added.]

*Id.* at 374, 267 P.2d at 768. On the issue of damages, we stated: "It is true that there may be great or little affection and that the damages should be proportionate to that which is taken away from the [injured spouse]." *Id.*

In an apparent effort to improve the fairness of this cause of action, recent cases in other jurisdictions have raised the plaintiff's burden of proof on the issue of causation and redefined the factors bearing on damages. For example, *Heist v. Heist,* 46 N.C.App. 521, 265 S.E.2d 434 (1980), which affirmed the plaintiff wife's recovery for alienation of affections, specifies the following considerations as bearing on those issues:

> In order to sustain a cause of action for alienation of affections, the plaintiff must show the following facts:
>
> (1) that she and her husband were happily married and that a genuine love and affection existed between them;
>
> (2) that the love and affection so existing was alienated and destroyed;
>
> (3) that the wrongful and malicious acts of defendant produced and brought about the loss and alienation of such love and affection....
>
> The wrongful and malicious conduct of the defendant need not be the sole cause of the alienation of affections. It suffices, according to the rule in a large majority of the cases, if the wrongful and malicious conduct of the defendant is *the controlling or effective cause of the alienation,* even though there were other causes, which might have contributed to the alienation. [Citations omitted; emphasis added.]

46 N.C.App. at 523, 265 S.E.2d at 436. *Accord, Thompson v. Chapman,* 93 N.M. 356, 357–58, 600 P.2d 302, 303–04 (N.M.Ct.App.), *cert. denied,* 92 N.M. 675, 593 P.2d 1078 (1979).[11]

---

11. Kansas and Hawaii have gone even further. Building on a well-developed body of case law in the area of alienation, *Long v. Fischer,* 210 Kan. 21, 25–26, 499 P.2d 1063, 1067 (1972), redefined the element of causation to make it practically impossible for a plaintiff to sustain the necessary burden of proof. This Kansas rule was adopted verbatim in *Hunt v. Chang,* 60 Hawaii 608, 594 P.2d 118 (1979).

After considering the various definitions enunciated in other states since our decision in *Wilson v. Oldroyd,* we are content to reaffirm the rules we established in that case, subject to the two following clarifications and elaborations.

First, the requirement that the defendant's acts must have constituted the "controlling cause" of the alienation of affections means that the causal effect of the defendant's conduct must have outweighed the combined effect of all other causes, including the conduct of the plaintiff spouse and the alienated spouse. For this purpose, a defendant is properly chargeable with the effect of mere acquiescence in the overtures of the alienated spouse where the defendant knows or has reason to know that such acquiescence will damage the marital relationship.

Second, in trying to make the damages "proportionate" to the loss of the injured spouse, the trier of fact should consider the duration and quality of the marriage relation, including the extent to which genuine feelings of love and affection existed between the spouses prior to the intervention of the defendant.

## III. PUNITIVE DAMAGES

For the further guidance of the district court on remand, we add two rulings on the law of punitive damages as applied to this case and this cause of action.

First, punitive damages can be recovered for the tort of alienation of affections. *Wilson v. Oldroyd,* 1 Utah 2d at 370, 267 P.2d at 765. As a general rule, punitive damages are available where the defendant's conduct was "wilful and malicious." *Kesler v. Rogers,* Utah, 542 P.2d 354, 359 (1975). However, our commitment to "caution" in the application of punitive damages, *First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* Utah, 653 P.2d 591, 598 (1982), and the fact that the elements of

willfulness and maliciousness are, in effect, part of the cause of action for alienation of affections,[12] persuade us to require something more with respect to this tort. To avoid a circumstance in which punitive damages are automatically available in every such cause of action, we hold that in order to recover punitive damages for the tort of alienation of affections the plaintiff must show "circumstances of aggravation in addition to the malice implied by law from the conduct of defendant in causing the separation of plaintiff and [his or her spouse] which was necessary to sustain a recovery of compensatory damages." *Heist v. Heist,* 46 N.C.App. at 527, 265 S.E.2d at 438; 41 Am.Jur.2d *Husband and Wife* § 485 (1968).

Second, the award of $25,000 in punitive damages in this case could not be sustained in any event because it was entered without adducing any evidence or making any findings of fact regarding defendant's net worth or income. While an award of punitive damages requires consideration of many factors, it is primarily intended to punish the defendant and thereby deter others similarly situated from imitating his conduct. *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d at 312; *First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* 653 P.2d at 598–99. Thus, the defendant's net worth and income are always relevant in determining the amount of punitive damages that would be appropriate for punishment. We have expressly held "that it is proper to receive evidence and consider the wealth of the defendant as bearing upon the issue of punitive damages" both in actions for alienation of affections, *Wilson v. Oldroyd,* 1 Utah 2d at 372, 267 P.2d at 766, and criminal conversation, *Cahoon v. Pelton,* 9 Utah 2d at 232, 342 P.2d at 99. To the contrary, where a trial record contained no evidence of the defendant's net worth or income, we have, on our own motion, reduced a judgment of punitive damages to

---

12. The tort of alienation of affections requires proof that the defendant "wilfully and intentionally" alienated the spouse's affections, *Wilson v. Oldroyd,* 1 Utah 2d at 367, 267 P.2d at 763, and the nature of the wrong inflicted is such that malice is, in effect, "a necessary ingredient of the tort." *Birchfield v. Birchfield,* 29 N.M. 19, 24, 217 P. 616, 619 (1923).

permit an award of no more than $6,000. *Cruz v. Montoya,* Utah, 660 P.2d 723, 727 (1983).

The judgment is reversed, and the case is remanded for a new trial in accordance with this opinion. Costs to appellant.

HOWE, J., concurs.

HALL, Chief Justice (concurring and dissenting):

I concur in the opinion of the Court insofar as it retains alienation of affections as a viable cause of action in the state of Utah, and insofar as it refuses to sustain the award of punitive damages (Parts II and III). However, I dissent from that portion of the opinion which remands the case for a new trial based on the conclusion that the defendant was denied due process of law.

Defendant claims that he was denied a fair trial because he was not afforded timely notice and was thus denied an opportunity to be heard in a meaningful way. His contention that he did not realize until two days before the trial began that he was to be prepared for trial and not merely for a "hearing," is simply not borne out by the record. On the contrary, it is clear that his alleged lack of knowledge stems not from an absence of notice and opportunity to be heard, but from his voluntary choice not to retain a new attorney and to represent himself.

On January 7, 1981, the trial judge set aside the earlier order of dismissal of the complaint, reinstated the action and set the case for trial on January 21, 1981. Defendant personally appeared at that time, *without counsel,* and heard the date being set. Defendant claims that he was misled by the use of the word "hearing" rather than "trial" and therefore was not given actual notice that he must face trial on January 21. This is a specious argument. Defendant's brief acknowledges that had defendant had

an attorney representing him, the attorney would have understood that he was facing a trial and not merely a hearing. Therefore, the resolution of this question hinges not on what defendant did know, but on what he should have known.

Article I, § 11 of the Utah Constitution and U.C.A., 1953, § 78–51–25 guarantee a party to a civil action the right to represent himself.[1] However, as the main opinion points out, the general rule is that a party appearing pro se is held to the same standards of knowledge, rules and procedures as would be a qualified attorney.[2] In fact, if a litigant, *for whatever reason,* sees fit to rely on himself as counsel, he must be prepared to accept the consequences of his mistakes and errors.[3]

Defendant voluntarily chose to appear at the January 7 hearing without an attorney; he did not question the judge as to exactly what would happen on January 21, as was his right and his duty if he was going to represent himself; and he did not thereafter consult an attorney as to the proper steps to be taken. He merely showed up at trial on January 21 and acknowledged that he intended to represent himself.

That the defendant had made the decision to represent himself in the trial before the court and that he was prepared to proceed without a continuance are clearly reflected in the record:

> THE COURT: Mr. Jacobsen?
>
> MR. JACOBSEN: Yes, Your Honor.
>
> THE COURT: Are you represented by an attorney, Mr. Jacobsen?
>
> MR. JACOBSEN: No, Your Honor. I'd like to offer a brief explanation of my apology for that.... I was unable to acquire legal counsel because of financial difficulties, so I spoke to Mr. Brown, the Prosecuting Attorney of Sanpete County, and he went over everything with me and advised me that because of my financial

---

1. *See also Heathman v. Hatch,* 13 Utah 2d 266, 268, 372 P.2d 990, 991 (1962).

2. *See, e.g., Manka v. Martin,* 200 Colo. 260, 614 P.2d 875, 880 (1980) (en banc); *Makin v. Liddle,* 102 Idaho 705, 639 P.2d 3, 4 (1981); *John-son v. Aetna Casualty & Surety Co. of Hartford,* Wyo., 630 P.2d 514, 517 (1981).

3. *Manka v. Martin,* supra n. 2, at 880.

situation, I'd better defend myself, so I'm prepared to do that.

THE COURT: You understand, of course, that it's the Court's obligation to hear the evidence and make a ruling based upon the evidence and be fair to both parties under the law; do you understand that?

MR. JACOBSEN: Yes, I do, Your Honor. I hope you'll bear with me in the fact that I'm not versed in any Court procedures or anything like that but—

THE COURT: You have a right to represent yourself and likewise I have to rule and make certain rulings that you might not understand.

MR. JACOBSEN: I understand. The terminology and everything will probably be—

THE COURT: Alright, are you prepared to go forward, Mr. Jacobsen?

MR. JACOBSEN: Yes, I am.

At this point, it would have been but a simple matter for defendant to protest to the trial judge that he needed more time to prepare or to retain a new attorney, that his files and depositions were still in the possession of his former attorney and thus not available to him in preparation of his defense, or that he wanted a jury trial. Had he but raised any of these questions to the trial court, we might have a different case here.

But he did not raise these questions and went forward with the trial. In so doing, he accepted the consequences of that action, ignorance of the law notwithstanding.

The main opinion points out that this Court has said that a layperson acting as his own attorney "should be accorded every consideration that may reasonably be indulged."[4] The record shows that the trial judge did make every effort to accommodate defendant's lack of legal knowledge during the trial. Preceding the trial, the judge carefully explained the procedures to be followed during the trial. As the trial went on, he further explained procedures, the bases for objections and the way to cure those objections. The judge also raised objections himself when plaintiff's counsel was pursuing an improper line of questioning. And finally, he occasionally overruled objections of plaintiff's counsel, explaining:

THE COURT: I know but he isn't a lawyer so I've got to be liberal with him, Mr. McIff, so your objection's overruled. I realize it's not proper but I feel like I've got to give latitude....

The main opinion, however, suggests that this is not enough and requires the trial court to caution the pro se litigant as to the risks of representing himself and to apprise the litigant of his available legal options.

Heretofore, there has been no requirement, in either the federal courts or the state courts, that a party appearing pro se in a civil trial must be cautioned as to the dangers and disadvantages of self-representation, nor must he be given a laundry list of all of his available legal options. While it is true that this caution must be given to pro se defendants in criminal trials,[5] the standard in civil trials is not nearly so stringent. In fact, the federal courts have held that there is no constitutional right to counsel at all in civil trials.[6]

Thus, the main opinion imposes an entirely new and rigid procedure on trial judges who are faced with pro se litigants. I believe that this stricture is neither necessary nor proper in civil trials.

The instant case is a good case in point. Having seen fit to retain counsel initially, defendant was obviously aware of the benefits to be derived from representation by counsel. Conversely, he had to have been aware of the hazards of going it alone. Having seen fit to discharge his former counsel, for whatever reason, and to pro-

---

**4.** *Supra* n. 1, 372 P.2d at 991.

**5.** *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State v. Dominguez,* Utah, 564 P.2d 768 (1977).

**6.** *Boulware v. Battaglia,* 344 F.Supp. 889, *aff'd,* 478 F.2d 1398 (D.Del.1972); *U.S. ex rel. Stuart v. Yeager,* 293 F.Supp. 1079 (D.N.J.1968), *aff'd,* 419 F.2d 126 (3rd Cir.1969), *cert. denied,* 397 U.S. 1055, 90 S.Ct. 1400, 25 L.Ed.2d 673 (1970).

ceed with the trial acting as his own attorney, he cannot be heard to complain now that he was deprived of due process of law because of results directly attributable to his own actions.

I believe that the trial judge exercised sound discretion in permitting the trial to go forward and that the defendant was not deprived of any constitutional protections.

STEWART, Justice (concurring and dissenting):

I concur in Parts I and III of the majority opinion. However, I dissent from Part II for the reason that the majority fixes the limitations of the tort of alienation of affections more broadly than I think justifiable.

When defined broadly the tort of alienation of affections largely ignores the almost invariable contributing influences of both the plaintiff and the plaintiff's estranged spouse in contributing to, if not creating in the first instance, a disharmonious relationship, which sometimes results in one or both of the unhappy spouses seeking other intimate relations with another person, however unjustifiable that may be. The delicate and often fragile bonds that unite a husband and wife can only flourish in an atmosphere of reciprocal tenderness. Yet marriage bonds are constantly subject to innumerable tensions and threatening forces that can never be measured juristically in any realistic way. The power of such forces is demonstrated in the fact that some 40% of the marriages in this country end in divorce. And it is not often that full responsibility for the breakdown of a marriage can be attributed with any great degree of assurance to one or the other of the parties, let alone solely to the conduct of a third person.

We do not live in a day, if ever there were one, when male or female Casanovas cast a spell that all but nullifies the willpower of a member of the opposite sex. Persons who have been married do not generally fall prey to overwhelmingly seductive powers of another like some inert piece of iron drawn inexorably into the ever-stronger field of power of a magnet. The affec-

tion of married persons for each other is usually alienated by their own conduct or misconduct.

Nevertheless, the tort of alienation of affections may provide a proper remedy for certain conduct that interferes with the marital relationship. Sex is a powerful force. There are those in special positions of power, status, or authority who may illicitly use sex to satisfy their own passions or for otherwise improper ends. There are any number of such relationships, i.e., professors and students; physicians and patients; psychiatrists, psychoanalysts, or psychologists and clients; and employers and employees. Those who use positions of power or authority for the purpose of obtaining sexual favors and produce an alienation of affections between the one in an inferior position and his or her spouse, abuse and overreach any legitimate power they may have. In such cases, the consequence may be not only the breakup of one or perhaps two marriages, but also unforeseeable consequences in the future lives of the children from such marriages.

In other cases, where there is no abuse of power or authority, I think the tort of alienation of affections will cause much more harm than any good it may do. The judicial invitation to often vindictive persons, who usually have not perceived the mote in their own eyes, to use the courts to lash back at paramours of their spouses, sometimes simply as a means of blackmail, will provide little protection to the marriage relationship, and never be a force for reestablishing that relationship. The ugliness of the inevitable disputes over fault in divorce cases will only be magnified in most alienation of affection cases and will not be offset by any countervailing good. I see little reason to promote such unseemly disputes when so little is likely to be gained, except in those types of cases where one person abuses his or her power or authority.

DURHAM, Justice (concurring in result and dissenting):

I join in the reversal of this judgment, but dissent from Part II of the majority

opinion because I believe that the cause of action for alienation of affections should be abolished. It is an anachronistic holdover from a bygone era which modern rationalizations have failed to justify. The majority opinion identifies and addresses in turn six arguments presented by the appellant for abolition of the cause of action. Although the majority opinion rejects each of the appellant's arguments separately, it fails to set forth any affirmative reasons in policy or precedent for the retention of this cause of action in Utah. The majority opinion goes on to make the requirements for recovery so difficult that it is unlikely anyone will ever pursue this cause of action in court again. By this approach, I believe the majority acknowledges that the cause of action is defective in its weak theoretical basis and the numerous opportunities it offers for abuse. However, instead of eliminating the cause of action in a forthright manner, the majority opinion preserves the cause of action in a way that insures that its most likely use will be *outside* of the courtroom, as a tool to extort "settlements" from prospective defendants. The cause of action for alienation of affections should be abolished because there is no longer any legal basis for its retention. It protects no interest and furthers no policy not better served by other means. A brief review of the history of alienation of affections reveals why this is so.

In the early days of the common law, marriages were entered into for economic, diplomatic or dynastic reasons and were, indeed, bargains with specific terms set by the families of the bride and groom. *See, e.g.,* Schultz, "Contractual Ordering of Marriage: A New Model for State Policy," 70 Cal.L.Rev. 211, 224–25 (1982). Consideration was offered by each party: the groom agreed to protect and support the bride and her children, and the bride agreed to bear heirs for the groom, educate them and administer the household. Individual marriage contracts and the rights of marriage were valuable incidents in feudal tenure both economically and militarily. *See, e.g.,* 3 Holdsworth, *History of English Law,* 61 (3d ed. 1923). In addition, the identification

of legitimate offspring was of crucial importance to inheritance laws. *See, e.g.,* Lippman, "The Breakdown of Consortium," 30 Colum.L.Rev. 651, 655 (1930); Comment, "Piracy on the Matrimonial High Seas—The Law and the Marital Interloper," 25 Sw.L.J. 594 (1971).

However, although the marriage relationship "was founded on contract [in the middle ages], . . . the rights and duties involved in the relationship were fixed to a large extent by law and not by the agreement of the parties; and the consequences of creating the relationship might affect third persons . . . ." 2 Holdsworth, *supra,* at 463. The marriage created a new *status* for each of the parties. The importance of status in medieval society can scarcely be overemphasized.

> That there were different classes of society which should be governed by different laws would have appeared a truism to the mediaeval legislature. . . . The king, the peer, the knight . . . all occupied definite and legally fixed places in the hierarchy of society . . . . [I]n the Middle Ages the difference in legal rules was conceived of as depending upon the necessary and natural differences in the structure of society.

*Id.* at 464. Individuality, as we now value that concept, would have been regarded as akin to anarchy, placing a person outside of the benefits and protection of the law and denying him or her a position from which to interact with society. As far as the law was concerned, a person's status and a person's identity were the same: individual characteristics were irrelevant.

A wife in this system occupied a particular status as a female and as a married person. Bracton described three categories of human beings: "There is also another division of human beings, that some are male and other female, and others hermaphrodites. And females differ from males in many respects, because their condition is worse than that of males." 1 Bracton, *Laws and Customs of England* * 35 (Twiss ed. 1879). Thus, as a female, the wife was considered her husband's inferior by her

nature. Canon law imposed the view that a husband and wife were one flesh and one person in the law and that the person was the husband. Therefore, during coverture, even the woman's separate status as an inferior female was subsumed in the conjugal unit. In this setting, a cause of action for the abduction of the wife, the ancestor of the cause of action for alienation of affections, recognized a challenge to the status of both husband and wife and vindicated real damage to contractual and feudal rights. Because of the wife's legal disability, her actual consent or lack of consent was not considered. The action was brought by the husband against the third party, regardless of the issue of the wife's consent. Under the feudal system, society at large had an economic, military and political interest in the enforcement of the marriage contract and the status of the married parties.

In the feudal era, because of the interconnections between interests in property and virtually all other aspects of society, "the law of property, and the remedies for the infringement of proprietary rights, were then much more highly developed than the law of contract, and the remedies for breach of contract." 8 Holdsworth, *supra,* at 427. The "law of crime and tort was narrow" and "permeated by the idea of trespass—by the idea, that is, of forcible damage to person or property." *Id.* at 421. In this era, taking into consideration the emphasis and development in the law, the highly structured nature of society, the accepted concept of the conjugal unit, and the inferior status of women, it is understandable that the husband's interest in his wife and their relationship was expressed as a proprietary interest and that it therefore supported an action in trespass against a third party.

Although the "bargained-for" contractual aspects of marriage declined and the Renaissance concept of individuality eventually replaced the feudal concept of societal status, the common law forms of pleading preserved the husband's action for damage to his marital rights as an action in trespass. The husband was said to have the

exclusive and legally enforceable right to his wife's services and company. The action was brought in trespass by the husband with a *"per quod consortium amisit,"* i.e., "whereby he lost the company [of his wife]," and was for "the loss and damage of the husband," not for damage suffered by the wife or the conjugal unit. *See Hyde v. Scyssor,* 79 Eng.Rep. 462 (1620). The action was likened to the action "brought by the master for the battery of his servant, *per quod servitium amisit,"* i.e., "whereby he lost the service [of his servant]." *Id.* By Blackstone's time, the husband's legal rights with respect to his wife were described by the term "consortium" and included her society and services. *See* Feinsinger, "Legislative Attack on 'Heart Balm,'" 33 Mich.L.Rev. 979, 989 (1935). The husband had a cause of action for an intentional interference with those rights. Under the title "Injuries Affecting a Husband," Blackstone described abduction of the wife as follows: "[A]bduction or taking her away may either be by fraud and persuasion, or open violence: though the law in both cases supposes force and constraint, *the wife having no power to consent ...*" 3 Blackstone, *Commentaries*\*139 (1768) (emphasis added). This action was exclusively the husband's to compensate him for *his* injuries. The wife had no similar cause of action, as traditionally she had no right to her husband's "services" but rather a right to his protection and support—unenforceable because of her legal disability. This disability was not viewed as an injustice in mid-eighteenth century England. Blackstone commented that "we may observe, that even the disabilities, which the wife lies under, are for the most part intended for her protection and benefit. So great a favorite is the female sex of the laws of England." *See* 1 Blackstone, *supra,* at \*445. Thus, the proprietary cause of action originally reflected widely accepted views of status and legal rights in a society where contractual and legal obligations incident to marriages were part of a system of political, military and property obligations. The remedy provided by the law for violation of

those rights and obligations addressed injury to the society's interest in those obligations. Moral infractions were separate matters left to the ecclesiastical courts. This cause of action for abduction gradually evolved into a personal tort action vindicating the husband's legal, not contractual, rights to his wife's services and society, called consortium. Parallel to this evolution, it may be seen that the rationale for the procedural disability of the married woman had broadened from the canonical "one flesh" to include the Blackstonian "protection and benefit" rationale.

The more modern form of the action for abduction appeared in England in 1745 when the court recognized a husband's right to recover for the "enticement" of his wife away from their home. *See Winsmore v. Greenbank,* Willes 577, 125 Eng.Rep. 1330 (1745). In the United States, the common law action for abduction or enticement of the wife was adopted in every state but Louisiana. *See* Feinsinger, *supra,* 33 Mich. L.Rev. at 992 and n. 17; Note, "The Suit of Alienation of Affections: Can Its Existence Be Justified Today?" 56 N.D.L.Rev. 239, 241 (1980). The definition of consortium, originally the husband's right to his wife's services and company, was gradually broadened to include love, affection and in general, good relationships in the family. For example, in *Jacobson v. Siddal,* 12 Or. 280, 7 P. 108 (1885), the court declared that "[t]he injury done the husband consists in the dishonor of his marriage bed, the loss of his wife's affection, and the comfort of her society, *as well as any pecuniary injury for loss of services.*" *Id.* at 285, 7 P. at 111 (emphasis added).

The growing unpopularity of the husband's proprietary rights in his wife's services was probably accelerated by the advent of the Married Women's Acts in the latter half of the nineteenth century, which removed the married woman's inability to sue and be sued. *See, e.g.,* Comment, *supra,* 25 Sw.L.J. at 596–97. Courts were forced to re-examine the basis for the cause of action in order to decide whether the husband's cause of action was now extinguished, or whether the cause of action could be extended to wives. The resulting discussions are notable for their variety. "While agreeing that the action was based primarily on loss of consortium, courts have defined the consequences variously as an injury to property, to the person, to personal rights, or to feelings." Feinsinger, *supra,* 33 Mich.L.Rev. at 993. Some courts found that the wife had no right to sue for criminal conversation or alienation of affections. In *Kroessin v. Keller,* 60 Minn. 372, 62 N.W. 438 (1895), the Minnesota court refused to find a wife's right to bring an action for criminal conversation, stating that the gist of the action was the possibility of illegitimate children and pointing out that "the wife whose husband commits adultery suffers no 'disgrace' and that in any event a woman [defendant] charged with adultery in all probability was not the seducer." *Id.* at 991. In *Duffies v. Duffies,* 76 Wis. 374, 45 N.W. 522 (1890), the Wisconsin court refused to find an action for alienation of a husband's affections. The court explained that such a cause of action would lead to a multitude of actions because a husband may be expected to yield to worldly temptations to which he is daily exposed, whereas a wife, with her purer nature, is occupied at home and not subject to such enticements. *Id.* at 993. *See also* Prosser, *Law of Torts* § 124, at 881 (4th ed. 1971).

The great majority of the states, however, sustained the right of the wife to maintain an action for criminal conversation and alienation of affections. *See, e.g.,* Feinsinger, *supra,* 33 Mich.L.Rev. at 993. In order to do this, courts were forced to define consortium to include more than the husband's well-established right to services, and to declare that the wife now had an equal right to consortium. *See, e.g.,* Oppenheim v. Kridel, 236 N.Y. 156, 140 N.E. 227 (1923). Many opinions, finding the proprietary interest distasteful, denied the clear historical basis of the husband's action in trespass, holding that the wife had an equal right to maintain the action because the enabling statutes removed the only barrier to her action, i.e., her legal disability to sue or be sued. *See, e.g., Clow v. Chapman,* 125

Mo. 101, 28 S.W. 328 (1894). The wife's legal disability was *not*, of course, the only reason she had possessed no cause of action in the common law. In the common law, she had no legally recognized right to her husband's services: the basis for the action was the injury to the *husband's* legal right to his *wife's* services. Ironically, it is this very proprietary interest, rejected by the courts as "archaic," which was granted to the wife.

> By force of the marriage contract, husband and wife are each entitled to the society and comfort of the other,—the one to as great an extent as the other. As a wife is now placed on an equality with her husband in respect of her property and personal rights, and as a husband may have his action, as against a third person, for enticing away his wife, the wife has her action against third persons for enticing away her husband.

*Id.* at 107, 28 S.W. at 330. Thus, while the courts of the era criticized the idea of a proprietary interest in the wife, the decisions gave the concept new life by granting to the wife the same proprietary right to sue for the loss of consortium. *See* Lippman, *supra,* 30 Colum.L.Rev. at 664.

In spite of the broadened definitions of consortium, it is clear that the term continued to denote a property interest. In *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), the United States Supreme Court addressed the question of whether a judgment for criminal conversation against the appellant had been discharged in bankruptcy. Under the bankruptcy act, a judgment could be discharged unless it had been recovered in an action "for wilful and malicious injuries to the person or property of another." The appellant argued that the judgment had been discharged because criminal conversation was not an injury to the respondent's "person" and that the gravamen of the action was loss of consortium, not injury to the property of the respondent. The Court held:

> We think it is made clear by these references to a few of the many cases on this subject that the cause of action by the husband is based upon the idea that the act of the defendant is a violation of the marital rights of the husband in the person of his wife, to the exclusion of all others, and so the act of the defendant is an injury *to the person and also to the property rights of the husband.*

*Id.* at 485, 24 S.Ct. at 508 (emphasis added). The same result was reached on the same question by the Kansas Supreme Court, where the judgment for alienation of affections was obtained by a wife. *See Leicester v. Hoadley,* 66 Kan. 172, 71 P. 318 (1903). In *Sullivan v. Valiquette,* 66 Colo. 170, 180 P. 91 (1919), the Colorado Supreme Court recognized "the right of the plaintiff to the body of his wife, and ... to her mind, unpolluted." *Id.* at 172, 180 P. at 91. In a suit brought by a wife against her father-in-law, the Connecticut Supreme Court declared that the "gist" of the action was loss of consortium described by the court as "a property right growing out of the marriage relation ...." *Hudima v. Hudyma,* 131 Conn. 281, 283–84, 39 A.2d 890, 891 (1944).

Another irony in the cases of this era lies in the fact that although the wife's legal disabilities were statutorily removed, the law continued to treat the wife as incapable of initiating or consenting to her own change of affections or seduction.

> For the purpose of maintaining the action, it is regarded as an actual trespass upon the marital rights of the husband although the consequent injury is really to the husband on account of the corruption of the body and mind of the wife, and it is in this view (that it is a trespass upon the rights of the husband) that it is held that the *consent of the wife makes no difference; that she is incapable of giving a consent to an injury to the husband.*

*Tinker v. Colwell, supra,* 193 U.S. at 483, 24 S.Ct. at 507 (citation omitted) (emphasis added). Thus, the alienated wife's active participation in a relationship with the defendant is considered to be irrelevant in most cases. The defendant bears the entire burden of having alienated the wife's affec-

tions, even where the facts reveal her willing, if not eager, cooperation. *Wilson v. Oldroyd,* 1 Utah 2d 362, 267 P.2d 759 (1954), cited by the majority opinion as Utah's leading case, and the instant case both illustrate this judicial tendency to ignore the wife's volitional capacity.

The de facto retention of the assumption that a wife is unable to consent to an injury to her husband is an anomaly not present in those cases where the wife is the plaintiff. To the contrary, in actions brought by wives, it was commonly held that it was a good defense to show that the alienated husband was the enticer and that the defendant had merely yielded to his "seductive arts." *Romaine v. Decker,* 11 App.Div. 20, 43 N.Y.S. 79 (1896). "The law imputes to [the defendant] no fault because of her attractiveness, nor because she may have been pleased with the admiration of plaintiff's husband." *Whitman v. Egbert,* 27 App.Div. 374, 50 N.Y.S. 3 (1898). In a peculiar Vermont case, the court commented that a wife could have no recovery against a prostitute for alienating the affections of her husband. "A single instance of adultery, had by a man accustomed to marital infidelities, with a common prostitute, who serves his purpose on a chance occasion, does not constitute the enticement and alienation essential to a recovery." *Nieberg v. Cohen,* 88 Vt. 281, 287, 92 A. 214, 217 (1914). Thus, when the defendant was a woman, she was frequently excused from liability by reason of a remnant of the old procedural disability in the form of judicial stereotyping which viewed men as aggressive and women as passive.

During the 1930s, there was widespread discussion regarding the so-called "heart balm" actions, which included breach of promise to marry, alienation of affections, seduction and criminal conversation. The abolition of these actions became a "cause celebre" in many states. As noted in the majority opinion, a majority of jurisdictions has eliminated the actions by statute or judicial decision. It was widely felt that such suits served no constructive purpose and, in fact, were vehicles for blackmail, extortion or coerced marriages. Although

the majority opinion finds it "noteworthy" that research uncovers only one case in which there was evidence of collusion and extortion, one would not realistically expect reported cases to reveal this sort of abuse. Frequently, the threat of filing such a suit would suffice to extract payment from a potential defendant. The instant case would not be before us now if the defendant had paid the proposed $5,000 "settlement" to this plaintiff, whose wife, often beaten and abused, left him by her own free will and choice. It is no answer to claim that groundless or collusive suits may be countered by actions for abuse of process or malicious prosecution. Even setting aside the burden and difficulty of bringing such suits successfully, that argument suggests that there is some point in locking the barn door after the horses are out. It is true, as the majority opinion points out, that there are other causes of action where the parties' private lives are displayed for public view, and that this aspect of such actions alone is not a sufficient basis for their demise. However, in child custody cases, the best interests of children are felt to counterbalance the sacrifice of parental privacy and dignity, and in defamation cases it is the plaintiff himself who puts his reputation on the line in order to defend it. In a cause of action for alienation of affections, the plaintiff assaults the privacy and reputation of the defendant for no justiciably defendable purpose.

It is for this reason that I strongly urge the abolition of the cause of action for alienation of affections: this is an action without legal content, signifying nothing but the desire to wring money and revenge from the pain of a failed relationship. The old common law cause of action had real content in the days when the husband had a legally recognized right to his wife's services. Although we now find the concept repugnant, in the past those legal rights accurately reflected the order and concensus of society regarding the status of married persons. In that society, it was logical that a court could find a third party responsible for damage to the husband's marital

rights because the wife had no legally recognized existence apart from her husband, and was generally considered more passive and persuadable by nature. Those days and those rights have passed and this cause of action should be gone with them.

The modern action for alienation of affections has become an action for interference with the mental and emotional attitude of one spouse toward the other. *See, e.g., Wyman v. Wallace,* 94 Wash.2d 99, 615 P.2d 452 (1980); Prosser, *supra,* at 876. The majority opinion posits no basis in statute or common law to support such an action. The argument is made that "[t]he marital relationship is entitled to no less protection than" other relational interests, referring to causes of action for loss of prospective economic relations, interference with a contractual relation and wrongful death. However, this analogy fails to recognize inherent differences between the marital relationship and other types of relationships. The relationship between married people does not resemble that between parties who undertake a commercial transaction based on pecuniary interests. In the usual contractual setting, the times at which the contract will begin and end and expectations for performance are identified and limited by the parties themselves. If the parties have dealt at arm's length, and there have been consideration and a meeting of minds, the law will both enforce the contract and protect its performance from third party interference. Our legal system is capable of this task because the obligations and the adequacy of their performance may be ascertained with a reasonable degree of accuracy. Therefore, if A is damaged in his contractual relationship with B, A has a cause of action against B if B has breached, or against C if C has wrongfully interfered with A's or B's performance, or against B *and* C if together they have damaged A. *See, e.g., Bunnell v. Bills,* 13 Utah 2d 83, 368 P.2d 597 (1962). It should be noted that if C interferes with the performance of the contract between A and B without their cooperation, *either* A or B could have a cause of action against C.

The relationship between a husband and wife bears no resemblance to the contractual paradigm which is the legal basis for loss of prospective economic relations and interference with a contractual relationship. Although we speak of the marriage "contract," it has been centuries since marriage has involved true contract principles in Western cultures. The purposes of marriage are not pecuniary. In our society, it is now widely accepted that men and women enter marriage to seek personal fulfillment and happiness. *See e.g.,* Schultz, *supra,* 70 Cal.L.Rev. at 250–51. Furthermore, unlike the parties to a contract, parties who wish to marry do not make their own law. The state, not the parties, controls who may marry, what procedure must be followed, and how and why the marriage may be terminated. In Utah, each spouse is required to support the other financially when necessary, *see* U.C.A., 1953, §§ 78–45–3 & –4, and neither may recover for loss of consortium when the spouse is injured by another. *See* U.C.A., 1953, § 30–2–4; *Tjas v. Proctor,* Utah, 591 P.2d 438 (1979). However, the statutes are silent regarding additional legal obligations of one spouse to the other. Our legislature has not seen fit to bestow a legal right on either partner to any quantum of love, devotion, companionship or commitment from the other. Neither has our legislature prescribed how long a neglected spouse must hope, how long a bored spouse must be patient, or how long an abused spouse must endure. Possibly, our legislature recognizes that *commitment* to the married state must be generated by the individual and cannot be enforced by law. Therefore, a person has no action against his spouse in law or equity for insufficient love and affection, for emotional neglect or even for abuse, apart from the criminal law. Where the State has mandated no condition which the married parties must satisfy, the law will give no cause of action for "breach" but only specific grounds for divorce. This is in accord with the longstanding "hands-off" policy in the law regarding interference with matters between husband and wife. *See, e.g.,* Schultz, *supra,* 70 Cal.L.Rev. at 232–34.

Therefore, in our society, which recognizes husbands and wives as separate individuals, which recognizes that devotion and commitment are personal and perhaps moral obligations but not legal obligations, which refuses to recognize a cause of action by one spouse against the other for failure to love, there is no ground in law or logic for recognizing a cause of action by one spouse against a third party to whom the other spouse has voluntarily transferred his affections. The comparison of the action for alienation of affections to actions protecting contractual relationships is superficial and misleading.

A similar point was made by the North Carolina Supreme Court in a suit brought by some children for alienation of the affection of their mother. The court noted that the mother's love and devotion were "matters within her keeping. The measure of their contribution is controlled by her willingness and capacity." *Henson v. Thomas,* 231 N.C. 173, 175, 56 S.E.2d 432, 434 (1949). The court continued:

> Since the mother, who is a free agent, committed no legal wrong for which redress may be had in a court of law, *it cannot be said that the defendant,* who allegedly induced her to be remiss in her domestic duties, *incurred any greater liability than the law attaches to her act.*
>
> To hold otherwise would mean that every time a person persuades or induces a mother to engage in other activities to such an extent as to cause her to neglect her children, he commits a tort for which he may be compelled to respond in damages.

*Id.* (emphasis added). The majority opinion declares that "a defendant is properly chargeable with the effect of mere acquiescence in the overtures of the alienated spouse where the defendant knows or has reason to know that such acquiescence will damage the marital relationship." This will surely be construed to mean that any person who acquiesces in the advances of another, whom he knows to be married at the time, may be held accountable at law for the subsequent failure of the marriage.

There is no basis in law for our courts to make such a judgment. Accountability for this type of relationship is better left to courts competent to render moral, rather than legal, judgments. If the law is to give a remedy against third parties who thus "intrude" into a marriage with harmful effect, we may next see a cause of action against demanding employers, distributors of lascivious movies and books, or even the producers of Monday night football, all of which damage many marriage relationships.

It should be noted that the comparison of the action for alienation of affections with recovery for loss of consortium in a wrongful death action is equally superficial. In a wrongful death action, the loss of consortium, i.e., loss of love, affection and society, is simply one way to measure the immeasurable: one value of a life is the ability to form relationships, and to give and receive affection. There is ample basis in statutory and common law for the protection of life. In an action for alienation of affection, the loss of love and affection is the loss of the relationship itself. As already discussed, neither statutory nor common law imposes any obligation on married persons to maintain love or affection for each other. There is no legal basis for one spouse to sue the other or a third party for the failure of the relationship. The comparison with a wrongful death action is invalid.

No one can seriously argue that a husband or wife, even in a troubled marriage, is helpless in the face of temptation. If a spouse is pursued by an aggressive third party, as postulated by the majority opinion, and rejects those advances to no avail, he or she can obtain an injunction against harassment, as did the husband in *Webber v. Gray,* 228 Ark. 289, 307 S.W.2d 80 (1957). The action lies with the pursued or annoyed husband or wife, however, not with the spouse for an injury to a legal right. If the husband or wife does *not* reject those advances, the betrayal is by the participating spouse against whom the law grants no remedy based on the marital relationship, save divorce. Perhaps the individual whose spouse has left him may have an action for intentional infliction of emotional distress

against that spouse or against the spouse and the third party. *See Stoker v. Stoker,* Utah, 616 P.2d 590 (1980) (confirming wife's right to an action against her husband for the intentional infliction of personal injuries). If the husband and wife have contracted with each other regarding specific marital obligations in addition to those imposed by law, perhaps a remedy for breach of that agreement may be sought by the party wronged. In either case, such an action would be brought as any tort or contract action and would not be derived from the marriage relationship itself as alienation of affections purports to be.

Devoid of any real basis in law, the action for alienation of affections is frequently upheld instead by moralizing:

> The injury for which it was recovered is one of the grossest which can be inflicted upon the husband, and the person who perpetuates it knows it is an offense of the most aggravated character; ....

*Tinker v. Colwell, supra,* 193 U.S. at 489–90, 24 S.Ct. at 509–10.

> Three thousand dollars is a small sum for such a case. A confessed adulterer who has enticed away his neighbor's wife is in no position to say much about excessive damages.

*Sullivan v. Valiquette, supra* 66 Colo. at 172, 180 P. at 92.

> The grievance is one of a social character, of course ... The incidence is too deep, however, to be ... left to the non-curial efforts of society itself to correct the antisocial tendencies and activities of its members; the slow-curing and festering wounds which leave cicatricial marks in the wake of the marauder.

*Henson v. Thomas, supra,* 231 N.C. at 178, 56 S.E.2d at 436 (Seawell, J., dissenting). Often, the moralizing or prejudice operates more subtly. The majority opinion quotes from *Heist v. Heist,* 46 N.C.App. 521, 265 S.E.2d 434 (1980). In North Carolina, a plaintiff must show that the spouses "were happily married and that a genuine love and affection existed ...." *Id.* at 523, 265 S.E.2d at 436. The court in *Heist* found the defendant liable for the failure of the mar-

riage on the flimsiest of evidence of genuine love and affection, disregarding evidence of longstanding disaffection and minimal tolerance between the husband and wife. As illustrated in *Heist* and in the instant case, and in every case predicated on alienation of affections, there is an inherent danger that a verdict will rest on the subjective judgment of the factfinder, rather than law. In the present case, the trial judge apparently ignored evidence of the plaintiff's violent treatment of his wife, and her independent decision to seek out the company of the defendant. At the close of trial, the judge declared:

> The Court finds that marriage and family—that marriage is a sacred institution and that anyone who interferes with that should suffer the full consequences of the law and I'm just telling you, Mr. Jacobsen, at this time that this Court nearly every week is having criminal trials where people steal money from other people and in my opinion you've stolen something far more than money, you have interfered with the whole basic fabric of society and, when you tell me it's a [platonic] relationship, I just say it's nonsense. I don't buy it at all and I don't want you to think I do. I don't know how they're going to collect any money judgments that I give against you but they're certainly going to get one against you and I hope this gets well publicized because I'd like everyone to know that if a case like this comes into my Court, that they can expect to suffer ....

The people of the State of Utah do not need this cause of action. It surely falls among those which do not "necessarily offer effective or efficient means of achieving the public good." Bok, "A Flawed System," Harv.Mag. 38, 40 (May-June, 1983). Advocating the reduction of volume and cost of litigation, the author of that article points out that "[b]y complicating the rules and insisting on an adversary process conducted by the parties, judges can undermine justice ...." *Id.* at 42. That is precisely what the majority opinion proposes to do: the final deaththrows of a broken

marriage are to be preserved with a more rigorous and technical set of requirements for recovery. Innocent parties must defend themselves, and then assert their right to be free of such actions by suing in separate actions for malicious prosecution or abuse of process. Nowhere does the majority point to a basis in law or a benefit to society to justify such a cost to the parties or to our judicial system.

As the court stated in *Henson v. Thomas, supra,* "The mutual rights and privileges of home life grow out of the marital status. Such obligations ... are not legal in nature and may not be made the subject of commerce and bartered at the counter." *Id.* 231 N.C. at 175, 56 S.E.2d at 433. It is time that we acknowledge the operation of the process spoken of by Justice Holmes whereby the customs and needs which give rise to a rule disappear but the rule remains, justified by some new policy based on new beliefs and customs. Holmes, *The Common Law* 5 (1881). This old "rule" does *not* have a basis in today's beliefs and customs. Its existence now testifies only to the persistence of an old form of action in our common law system and to the understandable but regretable human desire for revenge and a greenback poultice. This was a judicially instituted cause of action and should be judicially extinguished, especially since our legislature has never provided a statutory basis for it. *See Wyman v. Wallace, supra.* It should not be said of Utah that it is a place

Where juries cast up what a wife is
  worth,
By laying whate'er sum, in mulct they
  please on
The lover, who must pay a handsome
  price,
Because it is a marketable vice.

(Byron, Don Juan, Canto I, lxiv.)